ARMSTRONG CHEMCON, INC. *et al.*, Petitioners, *v.* THE POLLUTION CONTROL BOARD, Respondent.

(No. 55951; ▮▮▮▮▮▮▮▮▮▮

First District (4th Division)—February 20, 1974.

*Rehearing denied April 18, 1974.*

Edward F. O'Toole, Henry L. Pitts, W. Gerald Thursby, Lawrence M. Gill, and Clifton A. Lake, all of Chicago (O'Toole, Westrick & Harrison, and Hackbert, Rooks, Pitts, Fullagar & Poust, of counsel), for petitioners.

William J. Scott, Attorney General, of Chicago (Joseph V. Karaganis, Harvey M. Sheldon, and Lee A. Campbell, Assistant Attorneys General, of counsel), for respondent.

Mr. PRESIDING JUSTICE ADESKO delivered the opinion of the court:

Petitioners are a group of paint manufacturers and suppliers seeking initial judicial review in this court, pursuant to section 29 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1029), of the validity and application of the Illinois Pollution Control Board's regulation R70—5, limiting discharges of mercury to Illinois waters. Said section 29 provides:

"Any person adversely affected or threatened by any rule or regulation of the Board may obtain a determination of the validity

or application of such rule or regulation by petition for review under Section 41 of this Act [ch. 111½, par. 1041]."

Regulation R70—5 establishes (1) a water quality standard applicable to all waters of the State, and (2) an effluent standard applicable to all discharges into those waters and into all sewers within the State. Both the water quality standard and the effluent standard limit the maximum permissible concentration of mercury to 0.0005 parts per million (equivalent to 0.5 parts per billion). Pursuant to the water quality standard, Illinois waters may not contain concentrations of mercury in excess of the 0.5 parts per billion (hereafter "ppb") standard. Pursuant to the effluent standard no one may discharge into Illinois waters or sewers any effluent containing mercury in concentrations exceeding the 0.5 ppb standard.

On August 19, 1970, the Illinois Pollution Control Board authorized public hearings pursuant to section 28 to consider the adoption of proposed regulation R70—5, dealing with the discharge of mercury into the waters of the State. Hearings were held as prescribed by the Environmental Protection Act at several locations throughout the State, at which hearings testimony in support of and in opposition to the proposed regulation was offered by all persons wishing to do so. As a result of such hearings, the Board adopted the final draft of regulation R70—5 on March 31, 1971.

The issues presented for review are:

> (1) Did the Board exercise its rule making authority in an arbitrary and capricious manner in promulgating regulation R70—5?

> (2) May the Board lawfully promulgate a regulation affecting discharges to sewers?

Petitioners urge that the regulation is not supported by evidence in the record. It does contain objections to the regulation from representatives of paint and varnish manufacturing companies and chemical corporations. Leonard G. Goldwater, M.D., from Duke University Medical Center, was presented by Daniel S. Ring, who appeared at the hearing on behalf of the National Paint, Varnish and Lacquer Association. Goldwater testified that he was distressed to hear one of the speakers say that mercury was toxic in all forms, and that this is absolutely not true.

F. C. Caugash, Director of Environmental Control, Sherwin Williams Company, stated:

> "Our company would be affected by the proposed regulation at one part per billion because some of our effluent from our paint manufacturing when we wash out a tank or a latex product at the time of discharge is in excess of one part per billion. * * * In

our particular instance mercury is something that our supplier adds to the latexes before they are shipped to us. * * * I think there are substitutes being developed. I do not think they are available today."

██ We are mindful of the statutory provision that, "The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct" (Ill. Rev. Stat. 1971, ch. 110, par. 274). We are also mindful that the rule has also been declared to require that the "opposite conclusion must be clearly evident" before the administrative decision will be held contrary to the manifest weight of the evidence (*Legones v. License Appeal Commission,* 100 Ill.App.2d 394, 241 N.E.2d 499; *Wolbach v. Zoning Board of Appeals,* 82 Ill.App.2d 288, 226 N.E.2d 679).

Angell D. Sidio, Director of National Field Center and Federal Water Quality Administration, testified: "Mercuric compounds such as those found in fish and other animals concentrate in the human brain where cells are destroyed and neuro-toxicity develops. Very small quantities of mercuric compounds have a devastating effect on the human nervous system. The World Health Organization has suggested a maximum of .05 parts per million in food and the United States Food and Drug Administration has recommended and the equivalent Canadian Agency has established a limit of 0.5 parts per million in fish." He also stated: "When mercury goes into a stream it does not degrade, it converts to more toxic forms * * * and that once mercury goes into a stream or lake it doesn't disappear or degrade, but it will convert to more toxic forms. This does not mean that metallic mercury, or other less toxic forms of mercury, do not change form. Although some contaminants are converted by biological processes to less harmful or even harmless substances, in the case of mercury and its compounds, the conversion that occurs is in the direction of greater, not less, toxicity, i.e., towards highly toxic methyl mercury."

John Martin Wood, Associate Professor of Biochemistry in the School of Chemical Sciences at the University of Illinois, after describing and explaining effects of mercury concentration, concluded:

"The real problem is not the total mercury concentration, but how much of this mercury is methalmercury, because methalmercury is far more toxic than organic mercury. There is a relationship between the amount of inorganic mercury that is being put into rivers and streams and eventually finishes up as methalmercury. The prohibition should, however, prohibit not only the discharge of methalmercury, metallic mercury, but also the discharge of mercury in any form or in any of its compounds."

Neil F. Hartigan testified that he was the General Attorney for the Chicago Park District and a member of the Lake Michigan and Adjoining Land Study Commission and said as follows:

"We agree with the proposed standard to the extent that it is designed to restrict discharges into the lake water itself to a mercury concentration equal to the background level found on the lake. The Lake Michigan and Adjoining Land Study Commission is submitting an informational brief of this policy and position. The highlights of that brief are the following:

1. Mercury is a highly toxic substance.

2. Mercury is currently being found in the lake and in all likelihood additional mercury can only add up to the likelihood and scope of such dangers."

The mercury regulation R70—5 is not contrary to the manifest weight of the evidence. This regulation, like a statute, enjoys a presumption of validity. (*People v. Kueper*, 111 Ill.App.2d 42, 249 N.E.2d 335.) The authority of the Board to adopt this water quality and standard is clearly expressed in the statute (Ill. Rev. Stat. 1971, ch. 111½, par. 1011) which provides:

"It is the purpose of this Title to restore, maintain and enhance the purity of the waters of this State in order to protect health, welfare, property ,and the quality of life, and to assure that no contaminants are discharged into the waters without being given the degree of treatment or control necessary to prevent pollution."

■■ Having considered the testimony of all the witnesses contained in the record of this appeal, the briefs and oral arguments of counsel, we conclude that the mercury regulation R70—5 is not contrary to the manifest weight of the evidence.

■■ Petitioners also urge that the Board does not possess the power to regulate discharges into sewers; that it has exceeded its regulatory jurisdiction and that the construction urged by the Board to support its jurisdiction over sewers would result in an unconstitutional delegation of legislative authority. We do not agree. Section 2(b) of the Environmental Protection Act states as follows:

"It is the purpose of this Act * * * to establish a unified, state-wide program supplemented by private remedies, to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." (Ill. Rev. Stat. 1971, ch. 111½, par. 1002(b).)

Section 11 of the Act states:

"It is the purpose of this Title to restore, maintain, and enhance

the purity of the waters of this State in order to protect health, welfare, property, and the quality of life, and to assure that no contaminants are discharged into the waters without being given the degree of treatment or control necessary to prevent pollution." (Ill. Rev. Stat. 1971, ch. 111½, par. 1011.)

Section 13 of the Environmental Protection Act contains this language:

"The Board pursuant to procedures prescribed in Title VII of this Act, may adopt regulations to promote the purposes of this Title. Without limiting the generality of this authority, such regulations may among other things prescribe:

\* \* \*

(b) Effluent standards specifying the maximum amounts or concentrations, and the physical, thermal, chemical, biological and radioactive nature of contaminants that may be discharged into the waters." (Ill. Rev. Stat. 1971, ch. 111½, par. 1013(b).)

Waters are defined in section 3(*o*) of the Environmental Protection Act as:

"\* \* \* all accumulations of water, surface and underground, natural, and artificial, public and private, or parts thereof, which are wholly or partially within, flow through, or border upon this State."

It appears to us that the above language confers express authority upon the Board to regulate discharge to sewers.

We also add that the language of the statute referred to above by necessary implication authorized the Board to regulate discharges into sewers necessary to secure, preserve and promote public health.

We find no merit in the petitioners' contentions and therefore we sustain the validity of the mercury regulations.

Regulation R70—5 approved.

BURMAN and DIERINGER, JJ., concur.