SHELL OIL COMPANY *et al.*, Petitioners, *v.* THE POLLUTION CONTROL BOARD, Respondent.

Fifth District   No. 73-279

Opinion filed April 5, 1976.

KARNS, P. J., specially concurring.

Hackbert, Rooks, Pitts, Fullagar and Poust, of Chicago (Joseph S. Wright, Jr., and Clifton A. Lake, of counsel), for petitioners.

William J. Scott, Attorney General, of Chicago (Russell Eggert, Marvin Medintz, and George William Wolff, Assistant Attorneys General, of counsel), for respondent.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:
This action involves a petition for judicial review of Illinois Pollution Control Board Regulation R72—2, which regulates permissible levels of sound emissions from stationary sources. Petitioners maintain this action under sections 29 and 41 of the Illinois Environmental Protection Act (Ill. Rev. Stat., ch. 111½, §§1029, 1041)[1] providing for direct review in this

---

[1] Section 29 provides as follows:

"Any person adversely affected or threatened by any rule or regulation of the Board may obtain a determination of the validity or application of such rule or regulation by petition for review under Section 41 of this Act."

Section 41 provides in pertinent part:

"Any party to a Board hearing, any person who filed a complaint on which a hearing was denied, any person who has been denied a variance or permit under this Act, and any party adversely affected by a final order or determination of the Board may obtain judicial review, ° ° ° except that review shall be afforded directly in the Appellate Court for the District in which the cause of action arose."

court of regulations promulgated under the Act. As grounds for review, petitioners, corporations that own petroleum refineries and related facilities throughout the State, contend that the Illinois Pollution Control Board in adopting regulation R72—2 exceeded the authority delegated to it by the Environmental Protection Act,[2] and that the Rule as adopted infringes upon their due process rights. On appeal petitioners also argue that Rule 72—2 is invalid because it is contrary to the manifest weight of the evidence in the record.

The facts and background to this dispute are as follows. After the Illinois Environmental Protection Act became effective in 1970, the Illinois Institute for Environmental Quality formed a task force on noise to develop a proposed set of regulations for abating noise pollution. The Institute contracted with two consulting firms to provide expert assistance to the task force. Early in 1972, the task force presented a set of proposed regulations to the Illinois Pollution Control Board. Between June 22, 1972, and November 11, 1972, the Board conducted a series of public hearings throughout the State at which various criticisms and suggestions were offered.

The original proposal set up a system of land use classifications based on the Standard Land Use Coding Manual (SLUCM) devised by the U. S. Department of Transportation, which classified all land into Classes A, B, and C, corresponding to residential, business and manufacturing uses. A special provision regulated undeveloped land. The maximum permissible noise levels emitted to abutting Class A, B, and C property was based on the classification of the emitter. Emissions were to be measured at the property line of the emitter. For Class A receivers more stringent nighttime limits were imposed. There were also special provisions pertaining to emissions to nonabutting receivers, discrete tones, and the like.

After the initial series of hearings, several major modifications were made in the regulation as proposed, and a second round of hearings was scheduled between May 7, 1973, and May 12, 1973. The final draft incorporated several major changes in the applicability of the numerical limits to various noise situations. Under the final proposal, emissions were to be measured at the point of reception, not less than 25 feet from the emitter. Existing property line noise sources were exempted from the more stringent nighttime limits contained in Rule 203. Undeveloped land was unclassified and thus no longer subject to the numerical limits. Farmlands were reclassified as a Class C rather than as a Class B use. A rule regulating impulsive sound was added and the rule regulating nonabutting property deleted. The definition of discrete tones was revised so as to include fewer noise sources. Exemption from the numerical limits were broadened to cover certain equipment and land uses. This draft also added delayed compliance dates of from 12 months to three years for certain

---

[2] Ill. Rev. Stat., ch. 111½, par. 1001 *et seq.*

existing sources. The Board invited additional comment on this modification, and, on the basis of the comments received, some additional modifications were made, only two of which are important for the purposes of this appeal. First, petroleum refining land uses received a two-year compliance date in Rule 209(i). Second, a new Rule.201(d) was added which provided that where agricultural or undeveloped land abuts "B" or "C" land, such agricultural or undeveloped land could be classified as Class "B" or "C" by a government with zoning jurisdiction over such land. The purpose of this provision was to assure developers of "B" and "C" properties that they would not become subject to development of abutting properties that would require noise regulations more stringent than what was contemplated at the time of development.

The Pollution Control Board promulgated its final set of regulations on July 26, 1973. Subsequently, approximately 20 corporations and associations petitioned for judicial review of the noise regulations in various districts of the Illinois Court of Appeals. On January 7, 1974, one of those petitioners, the Illinois Coal Operators Association, moved for leave to take a direct appeal to the Supreme Court, which motion was granted. Thereafter, petitioners in this cause, together with others from different districts, moved for leave to participate as *amicus curiae* in the Coal Operators proceeding in the Supreme Court, which motion was granted on February 14, 1974. After petitioners were informed by counsel for the Coal Operators Association that the Supreme Court proceedings would be more limited in scope than petitioners had believed, petitioners moved for leave to withdraw as *amicus curiae*, which motion was granted. On February 10, 1975, the Supreme Court filed an order transferring certain petitions for review pending in the First District[3] to this district for consolidation with Cause No. 73-279.

■▌ Petitioners first contend that the Board in promulgating its noise pollution regulations exceeded the authority delegated to it under the Environmental Protection Act. Section 23 of the Illinois Environmental Protection Act (Ill. Rev. Stat., ch. 111½, par. 1023), provides in pertinent part that "[i]t is the purpose of this Title [sections 23—25 of the Act] to prevent noise which creates a public nuisance." It is petitioner's theory that under this section the Board is limited to promulgating a set of regulations that incorporate the definition of "public nuisance" as the term has developed at common law. Thus, under this analysis, the Board unlawfully has attempted to regulate noise emissions that do not reach the level of the traditional public nuisance because the Board based its emission standards in part on such considerations as speech interference, and community response to indoor and outdoor noise levels. We believe that petition-

---

[3] These petitions were originally filed in the First District by Amoco Oil Co., Shell Oil Co., and Marathon Oil Co.

er's position is without merit. Even if we were to assume, for the sake of argument, that the legislature did in fact intend the Board to codify in a set of regulations only the conditions under which the emission of noise would constitute a public nuisance,[4] we cannot say that the Board is limited to any one set of criteria as a basis for regulating maximum permissible noise emissions. It is clear by now that the term "nuisance" is incapable of any exact or comprehensive definition. (See W. Prosser, Handbook of the Law of Torts 571 (4th ed. 1971).) The term "public nuisance" is said to comprehend "a miscellaneous and diversified group of minor criminal offenses, based on some interference with the interests of the community, or the comfort and convenience of the general public." We cannot say, therefore, that the criteria used by the Board do not fall within this broad concept.

Petitioners also contend that the Board has exceeded its authority in promulgating Rule 102. Rule 102, a general provision preceding those rules establishing numerical limitation on sound emissions for property line noise sources, provides as follows:

"No person shall cause or allow the emission of sound beyond the boundaries of his property so as to cause noise pollution in Illinois, or so as to violate any provision of this chapter or the Illinois Environmental Protection Act."

Petitioners read the terms of this provision literally. Thus, under their analysis, a violation can occur either through the emission of sound which exceeds the decibel limitations established in Rules 202 through 207 *or* which unreasonably interferes with the enjoyment of life or lawful business as the term "noise pollution" is defined in Rule 101(j). The terms of the legislative prohibition of noise pollution contained in section 24 of the Environmental Protection Act would appear, however, to contemplate the use of such an alternative standard. Section 24 of the Act provides:

"No person shall emit beyond the boundaries of his property any noise that unreasonably interferes with the enjoyment of life or with any lawful business or activity so as to violate any regulation or standard adopted by the Board under this Act." Ill. Rev. Stat., ch. 111½, §1024.

■■ We believe petitioners' position to be without merit. The Supreme Court's recent decision in *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 319 N.E.2d 782, is controlling here. Section 25 of the Act states that the Board shall categorize the types of noise emissions that unreasonably interfere with the enjoyment of life and lawful business activities and empowers the Board to establish maximum permissible limits for noise emissions. Thus, reading this section in con-

---

[4] *Cf. City of Monmouth v. Pollution Control Board*, 57 Ill. 2d 482, 313 N.E.2d 161, 163 (1974) (remedies provided by the Act to abate air pollution are in addition to those recognized at common law).

nection with section 24, it is clear that "[t]he basic violation was to be unreasonably interfering through noise with the enjoyment of life or lawful activity, and it is clear that it was contemplated by the legislature that the Board would adopt standards or regulations to define or identify noise emissions which constituted such unreasonable interference." (*Illinois Coal Operators Association v. Pollution Control Board*, at 309.) Rule 102, as construed in *Coal Operators Association*, simply prohibits emissions that unreasonably interfere with life or activities whether such emissions violate section 24 generally or a particular Board regulation.

We next consider petitioners' challenge to the general validity of the rules in question here. Section 27 of the Act mandates that certain factors be considered by the Board in exercising its rule-making authority. Section 27 provides in pertinent part as follows:

"In promulgating regulations under this Act, the Board shall take into account the existing physical conditions, the character of the area involved, * * * , and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution." (Ill. Rev. Stat., ch. 111½, §1027.)

Petitioners maintain that the rules are invalid because the manifest weight of the evidence in the rule-making record does not support the Board's conclusions that the noise emission standards and compliance dates are technically feasible and economically reasonable. Respondent contends that the proper standard for review is whether the Board's action is arbitrary and capricious.

In the *Coal Operators* case, the Illinois Pollution Control Board contended that the Supreme Court should not set aside the Board's action unless it found that the Board's action was arbitrary and capricious. In its brief, the respondent carefully delineated the difference in the standard the courts use for reviewing the decisions of an administrative body performing an adjudicatory function as contrasted with the situation when the body is performing a rule-making function. In an adjudicatory proceeding the courts will uphold the decision of the administrative body unless the decision is contrary to the manifest weight of the evidence; however, in a rule-making proceeding a rule adopted pursuant to statutory authority will not be set aside unless the action of the Board in adopting the rule is arbitrary and capricious.

The Supreme Court adopted the arbitrary and capricious standard in *Illinois Coal Operators Association v. Pollution Control Board*, saying:

"Another complaint of the petitioner is that the Board has violated the legislative intention in arbitrarily imposing sound-emission limitations without regard to whether such emissions in actuality would unreasonably interfere with the enjoyment of life or any lawful business or activity. That generally stated complaint is to be

answered by observing that administrative action taken under statutory authority will not be set aside unless it has been clearly arbitrary, unreasonable or capricious. [Citations.] The Board adopted its regulations only after their having been proposed by the qualified group which composed the Task Force on Noise and its consultants and only after 16 public hearings had been held by the Board extending for a period of almost a year. We cannot say that the rules which resulted from this study are clearly arbitrary, unreasonable or capricious." 59 Ill. 2d 305, 310.

By thus enunciating the above standard, the Illinois Supreme Court apparently rejected the broader "manifest weight of the evidence" standard used by the First District Appellate Court in *Armstrong Chemcon, Inc. v. Pollution Control Board,* 18 Ill. App. 3d 753, 310 N.E.2d 648, decided nine months earlier. However, the Supreme Court did not detail what it intended by the phrase "clearly arbitrary, unreasonable or capricious." The only indication given was that rules, which had been proposed by a highly qualified group and only adopted by the Pollution Control Board after 16 public hearings, did not fall within the arbitrary, unreasonable or capricious category. It is especially noteworthy that the Supreme Court in the *Illinois Coal Operators* case did not scrutinize the evidence placed before the Board.

One month after the Supreme Court handed down its decision the First District Appellate Court decided the case of *Commonwealth Edison Co. v. Pollution Control Board,* 25 Ill. App. 3d 271, 323 N.E.2d 84.[5] Plaintiff in that case challenged regulations promulgated by the Board which limited emissions of particulates and sulfur dioxide. Ostensibly, the court applied the standard which had recently been announced by the Illinois Supreme Court, that agency regulations were to be upheld unless clearly arbitrary, unreasonable or capricious. However, in so doing the appellate court extensively reviewed the evidence in the record to arrive at its decision that the regulations there in question were indeed arbitrary, unreasonable and capricious.

When an administrative agency exercises its rule-making powers, it is performing a quasi-legislative (as opposed to a quasi-judicial) function. This fundamental principle explains the discrepancy in the standards of judicial review of each type of proceedings; that is, when dealing with an adjudicatory proceeding, a reviewing court may only set aside the agency decision if it is clearly against the manifest weight of the evidence. When reviewing administrative rules and regulations, on the other hand, a court may not invalidate the regulation unless it is clearly arbitrary, unreason-

---

[5] This case was recently reviewed by the Illinois Supreme Court (*Commonwealth Edison Co. v. Pollution Control Board,* 62 Ill. 2d 494) and reversed in part and affirmed in part. The petition for rehearing was denied. However, nothing said in that opinion affects our discussion of the case.

able or capricious, because administrative agencies are inherently more qualified to decide technical problems and the mechanics of dealing with them. Because the courts lack the expertise possessed by administrative agencies, they should hesitate to find a regulation unreasonable. To the contrary is the situation where technical expertise is not a significant factor in making the rule. In those situations, a court's role is analogous to that of an appellate court reviewing a trial court's decision. By definition, however, the Pollution Control Board's regulations in these cases are founded upon application of agency expertise. The courts should not, and by general agreement may not, act as "superagencies." Such is essential if the basic notion of separation of powers is to survive.

Yet when a court examines the record before an agency, after an agency adopts a general rule, and decides that although there was some evidence of technological feasibility and economic reasonableness, the evidence was insufficient to justify the court's holding that the agency had considered it, the court is, in effect, weighing the evidence and applying the "manifest weight of the evidence" test rejected by the Supreme Court. This is precisely what occurred in the *Commonwealth Edison* case.

In an article entitled *Rulemaking under the Illinois Pollution Law*, 42 U. Chi. L. Rev. 457 (1975), David P. Currie, Professor of Law, former Illinois Coordinator of Environmental Quality and former Chairman of the Illinois Pollution Control Board, criticized the finding of the court in *Commonwealth* that the Board had failed to "take into account" the feasibility of compliance:

> "The court's conclusion  *  *  *  was surely hyperbole; the Board devoted, for example, two pages to summarizing and drawing conclusions from the evidence on technology for controlling sulfur emissions.  *  *  *
>
>  *  *  * It had agreed with another expert witness, not cited by the court, that 'on the admitted facts the development of sulfur control technology has advanced to the point where we are justified in requiring additional installations to be made *  *  *.'" (42 U. Chi. L. Rev. 457, 501-02.)

Thus, the Board, on the basis of its expertise, made a policy decision which was subsequently invalidated as "capricious" by a court on the basis of its judicial wisdom. As expressed by Professor Currie

"  *  *  * I would have thought that the exercise of judgment on such questions of policy was precisely what the Board was for and that the court essentially substituted its judgment for that of the Board on a highly debatable matter." (42 U. Chi. L. Rev. 457, 503.)

Thus, while professing to apply the arbitrary and capricious standard of review, the First District, through an extensive examination of the evi-

dence, actually weighed the evidence in making its final determination. Not being bound by this decision, we decline to follow it.

■■ In the *Commonwealth Edison* case the court held that the rules can be held valid only when it can be shown from the evidence in the record that the Board concluded in promulgating the rules that it was technically feasible and economically reasonable for a substantial number of emission sources in Illinois to comply. There was no such requirement in the statute. Courts of review should not establish any evidentiary hurdles for the Board to clear on the question of technical feasibility and economic reasonableness. The record should reflect only that these factors were taken into account. The phrase, "take into account," when used in its general sense, means "allow for, make allowance for, weigh carefully, consider, take into consideration, bear in mind, remember, realize, appreciate, have in one's mind." (See J. I. Rodale, The Synonym Finder.) If we interpret the statute the way it is written, our scope of review will be one that we can properly perform.

In *Commonwealth Edison* the First District has elected to treat Board rule-making as if it were quasi-judicial rather than legislative in nature and has accordingly required the Board to affirmatively establish, on the record, the validity of its own regulations. In effect the First District Court has placed upon the Board a burden of proof; the court has also indicated that it will review the informal record assembled at those hearings in order to determine whether the Board has met its burden of proof.

We believe that this interpretation of the Board's duties under the Environmental Protection Act is incorrect and that the very active role assumed by the First district is an inappropriate one for review of administrative action which is in essence legislative in character. The question squarely presented in this action is whether broad, regulatory enactments of the Board are, much like a statute, entitled to a presumption of validity which must be affirmatively overcome by the party who asserts their invalidity or whether they are to be held invalid absent some proof by the Board that it has considered economic reasonableness, technical feasibility, compatibility with local zoning and all other factors listed in section 27 of the Act. Ill. Rev. Stat., ch. 111½, §1027.

For this court to assume the active role which petitioner here wishes it to play, it will be necessary for the court to put to the side the deference normally accorded the expert judgment of administrative agencies and to ignore the clear intent of both the General Assembly as expressed in the Environmental Protection Act and the Supreme Court's interpretation of that intent as set forth in its opinion in *Illinois Coal Operators Association v. Pollution Control Board.*

■■ Perhaps the first rule of construction as to administrative rules and regulations is that rules made in the exercise of a power delegated by

statute should be construed together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason. The second rule is that generally the same rules of construction and interpretation govern the construction and interpretation of rules and regulations of administrative agencies as apply to statutes in the same field. 2 Am. Jr. 2d *Administrative Law* §307 (1962).

In this regard the Supreme Court of Illinois recently concisely reiterated fundamental rules of statutory construction in *General Motors Corp. v. Industrial Com.*, 62 Ill. 2d 106, 338 N.E.2d 561:

> "The cardinal rule of all statutory construction, to which other rules are subordinate, is that the true intent and meaning of the legislature must be ascertained and given effect. [Citation.] The language used in a statute is the primary source for determining this intent, and where that language is certain and unambiguous, the proper function of the courts is to enforce the statute as enacted. [Citation.] Absent statutory definitions indicating a different legislative intention, courts will assume that words have their ordinary and popularly understood meaning." (62 Ill. 2d 106, 112.)

Applying these rules to the Act, it is apparent that the phrase, "take into account," means only that the Board must consider technical feasibility and economic reasonableness along with other factors in promulgating its noise regulations.

In exercising its rule-making function under the Act, the Board is provided with a set of standards that prescribe certain considerations that must be taken into account in the promulgation of all pollution control regulations adopted pursuant to the Act. Section 27 provides in pertinent part:

> " * * * In promulgating regulations under this Act, the Board shall take into account the existing physical conditions, the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution. The generality of this grant of authority shall only be limited by the specifications of particular classes of regulations elsewhere in this Act." Ill. Rev. Stat. 1971, ch. 111½, §1027.

■■ The dispute in this case arises from the requirement that the Board take into account the technical feasibility and economic reasonableness of its regulations. The fundamental issue concerns the meaning of the phrase, "the Board shall take into account." Respondent argues that section 27 requires no more than a general consideration of the various factors set forth therein and that the Board is under no affirmative duty to

introduce evidence or make formal findings with respect to those specific factors. Petitioner argues that the Board must conclude that its regulations are technically feasible and economically reasonable for a substantial number of sources within the State. Petitioner further contends that the Board cannot so conclude unless it has correlated existing noise control technology and the cost of compliance for existing facilities in the State of Illinois with the specifics of the noise regulations. We disagree. Section 27 and the standards set forth therein reflect a legislative intent to prescribe Board rule making to the extent necessary to ensure that the Board acts within the bounds of its delegated authority. This does not mandate any particular standards that the Board must comply with in adopting its rules.

The broad requirement that the Board "take into account" certain factors in promulgating its pollution control regulations reflects a legislative recognition of the complexities of pollution control technology and of the differing levels of sophistication of control methods associated with various types of pollution. The requirement of section 27 is a flexible one and of necessity requires that a great deal of discretion be exercised by the Board.

An examination of the Act reveals its purpose to be the establishment of a "unified, state-wide program  *  *  *  to restore, protect and enhance the quality of the environment" (Ill. Rev. Stat. 1971, ch. 111½, §1002(b)). Having found that "environmental damage seriously endangers the public health and welfare" (Ill. Rev. Stat. 1971, ch. 111½, §1002(a)(i)), the legislature has mandated the Board to promulgate regulations to protect the general health and welfare. The legislature qualified that power only to the extent that the Board's regulations be reasonable in that they take into account the factors enumerated in section 27. Petitioners' brief submits as evidence of the Board's failure to consider the technical feasibility and economic reasonableness of its regulations, the Board's admissions that it could not estimate how many companies might be in violation of the proposed limitations and that it might not be possible to control some existing sources.

The suggestion that the Board, in order to adopt a rule establishing certain emission standards, must produce direct evidence that the control technologies necessary to meet those standards are technically feasible and economically reasonable for a substantial number of the sources throughout the State, would necessarily limit the Board's regulations to a contemplation of existing technology only. This interpretation is unreasonable and contrary to the stated policy of the Act to establish a state-wide program to restore, protect and enhance the quality of the environment. Clearly, the legislature did not intend by section 27 that the Board would be limited by the technology of control systems solely existent at

the time of the adoption of its rules. The development of pollution control technologies does not result solely from the initiative of polluting industries. Rather, it occurs largely in response to emission standards which are established through the legislative and administrative process for the protection of the general public. If, in the promulgation of regulations and emission standards, the Board was required to show that its maximum permissible emission levels could be achieved through the use of control systems which were technically feasible and economically reasonable for a substantial number of the sources within the State at the time of adoption of the regulations, the Board would be seriously hampered in fulfilling the mandate of the Act to "restore, protect and enhance the quality of the environment." Because the establishment of meaningful emission standards must of necessity be based upon predictions, projections and expert judgments regarding the seriousness of the threat to the public health and welfare posed by a certain type of pollution and the effectiveness and reasonableness of various control technologies, a requirement that the Board produce direct evidence with regard to these variables for the sources within the State would preclude the development of much seriously needed environmental regulation. The legislature in enacting section 27 certainly did not intend such a result.

That the legislature intended the Board's obligation under section 27 to be a flexible one and a matter of Board discretion, and did not intend by that section to impose a specific evidentiary burden on the Board applicable to all areas of pollution control contemplated by the Act is clearly evident from a reading of section 27 in conjunction with other sections of the Act. As discussed earlier, the apparent purpose of section 27 is to set forth general standards applicable to the Board's rule-making process to ensure that the regulations adopted by the Board are reasonable. Section 27 does not impose specific requirements applicable to the resolution of individual challenges of regulations; rather, it sets forth general standards prescribing the Board's legislative function. Where the legislature has intended to allocate specific evidentiary burdens as a condition precedent to an exercise of the Board's powers, it has clearly and explicitly done so. (Ill. Rev. Stat. 1971, ch. 111½, §§1031(c), 1033(c), 1035, 1037.) In the only instance in which the legislature did impose affirmative evidentiary limits upon the Board's rule-making powers, it did so explicitly. (Ill. Rev. Stat. 1971, ch. 111½, §1010 (leaf burning regulations).) Petitioner's concern that the Board's regulations may impose unreasonable economic burdens on specific polluters in the State was also of concern to the legislature, as evidenced by the requirements of sections 35 and 37. Those sections concern the granting of a variance by the Board from its regulations and they require specific findings regarding economic reasonableness and individual hardship. In the event that petitioner concludes that the Board's regu-

lations subject it to an unreasonable economic hardship, an appropriate resolution of this problem is provided for in the variance procedure. This conclusion cannot be arbitrary, but must be based upon legislative facts elicited at public hearings.

Legislative facts are facts which do not concern any particular individual; they typically involve expert opinions, predictions, forecasts and estimates concerning present or future, rather than past, events. They are the type of facts utilized by a legislative or quasi-legislative body in the course of exercising discretion and formulating policy for the governance of future conduct. The specifics of the Board's cost evaluations, however, are a matter of administrative discretion, and the Board is not required to produce a record which discloses that a substantial number of the polluters in the State can reasonably afford the cost and operation of the requisite control equipment.

■■ Based on the testimony taken at 16 different hearings on the noise regulations, the Board concluded that the regulations were technically feasible and economically reasonable. The data evaluated by the Board indicated that the regulations were economically reasonable with regard to both the capability of limiting noise emissions from particular property line noise sources (the principal subject of the regulations) and from specific facilities, processes and equipment. The evidence included some 25 detailed case studies that were chosen to be representative of the various types of noise pollution problems that exist across the entire spectrum of industry. These cases included noise emission problems typically found in property line noise sources. In each of the cases significant noise reductions were achieved at low costs. The record shows that the research and development, and the fundamentals and application of noise abatement are fairly well established.

In our opinion, the Board did have sufficient data before it to show that it did take into account the technical feasibility and economic reasonableness of the noise regulations. Accordingly, the disputed noise regulations adopted by the Illinois Pollution Control Board are affirmed.

Affirmed.

CARTER, J., concurs.

Mr. PRESIDING JUSTICE KARNS, specially concurring:

I concur in the opinion of the court as I believe it adopts the appropriate standard for judicial review of rule-making proceedings before the Pollution Control Board.

Sections 29 and 41 of the Environmental Protection Act (Ill. Rev. Stat. 1975, ch. 111½, pars. 1029, 1041) afford persons "adversely affected or threatened" an opportunity to seek immediate review of the Board's rules.

These provisions thrust the judiciary into a review of administrative rule making immediately after a rule is adopted and are, to my knowledge, unique in their apparent breadth of judicial review before enforcement. These sections implement the obvious policy of the Environmental Protection Act to secure immediate judicial review of the propriety of the promulgated rules thereby avoiding uncertainty as to their enforceability. Although the statute contains no restriction upon the extent to which a court may review and weigh the evidence upon which the Board's actions are based, our experience with review of rule making under these provisions has demonstrated to us the theoretical and practical considerations which must limit the literal meaning of the statute.

Rule making is essentially a legislative function. An unbridled review of this procedure would place a court in a role of a supervisory legislative body, contrary to the separation of powers clause in our constitution. (Ill. Const. 1970, art. II, §1.) Illinois courts have "judicial power" while the legislative power of this State is reserved to the General Assembly and its instrumentalities. (Ill. Const. 1970, art. VI, §1.) I do not believe that the authority conferred upon the courts to review decisions of administrative agencies (Ill. Const. 1970, art. VI, §6) in any way enlarges the traditional scope of our power or authorizes courts to exercise legislative functions. The promulgation of environmental protection rules is a complex task, requiring the presumed expertise of the Pollution Control Board in the analysis of legislative facts. Courts are not equipped to determine the wisdom and inherent fairness of these rules in an abstract context and thus should not attempt to weigh and analyze the mass of evidence that forms the basis of rule making. Courts should therefore limit review of rule making to matters which are suitable for judicial review.

Unrestrained judicial review of administrative rule making also suggests possible constitutional problems. While our constitution does not explicitly limit judicial power to cases or controversies, I believe this conceptual requirement is inherent in the judicial power of Illinois courts. In the Federal system, the United States Constitution grants judicial power only to decide "cases and controversies." The jurisdiction of Federal courts is limited to actual controversies between adverse litigants and does not include the power to give advisory opinions. (*Muskrat v. United States*, 219 U.S. 346, 55 L. Ed. 246, 31 S. Ct. 250 (1911).) The judicial power of Illinois courts does not authorize the granting of advisory opinions. (*North Chicago Hebrew Congregation v. Board of Appeals*, 358 Ill. 549, 567, 193 N.E. 519 (1934) (concurring opinion); Letter from Justices of Illinois Supreme Court to Governor Deneen, August 23, 1909, 243 Ill. 14 (1909).) When faced with moot questions, Illinois courts have declined to exercise their decisional power because the absence of an actual controversy was fatal to their jurisdiction. *La Salle National Bank v. City*

*of Chicago,* 3 Ill. 2d 375, 121 N.E.2d 486 (1954); *Wick v. Chicago Telephone Co.,* 277 Ill. 338, 341 (1917); *Tuttle v. Gunderson,* 341 Ill. 36, 173 N.E. 175 (1930); *People v. Dawson,* 5 Ill. App. 3d 975, 284 N.E.2d 391 (1972); see also *Chicago City Bank and Trust Co. v. Board of Education,* 386 Ill. 508, 54 N.E.2d 498 (1944).) A matter is appropriate for judicial determination only when it is neither hypothetical nor abstract but definite and concrete touching the legal relations of parties having adverse legal interests. *Exchange National Bank v. County of Cook,* 6 Ill. 2d 419, 129 N.E.2d 1 (1955).

Unrestrained judicial review of administrative rule making clearly violates the sound judicial policy of limiting judicial involvement to cases "ripe" for adjudication. The basic rationale of the ripeness doctrine in the Federal system as applied to preenforcement review of administrative rules is avoidance of judicial entanglement in abstract disputes over administrative policies and protection of agencies from judicial interference until the effects of their policies are felt in a concrete manner by challenging parties. (*Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967).) As stated in *Abbott Laboratories* and its companion decisions, *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S. Ct. 1520, 18 L. Ed. 2d 697 (1967), and *Gardner v. Toilet Goods Association,* 387 U.S. 167, 87 S. Ct. 1526, 18 L. Ed. 2d 704, (1967), two inquiries must be made: the fitness of the issues for judicial decision and the hardship to the parties that might result from denial of review. This requirement of ripeness is inherent in the concept of the judicial power of Illinois courts and was incorporated by the Illinois Supreme Court in *Exchange National Bank* in its definition of "actual controversy." Illinois courts have explicitly tested the ripeness of cases involving a challenge to administrative actions (*e.g., Alfred Engineering, Inc. v. Illinois Fair Employment Practices Com.,* 19 Ill. App. 3d 592, 312 N.E.2d 61 (1974)), and the need for ripeness as set out in *Abbott Laboratories* and the *Toilet Goods Association* cases has been stated as being "completely in accord" with Illinois case law. (*Gromer Supermarkets v. Pollution Control Board,* 6 Ill. App. 3d 1036, 1043, 287 N.E.2d 1, 6 (1972).) It is suggested that the basis of our Supreme Court's decision in *Commonwealth Edison Co. v. Pollution Control Board,* 62 Ill. 2d 494 (1976), turned largely on considerations of ripeness.

The standard of review announced by this court avoids encroachment upon the prerogatives of the legislative branch of government and limits review to issues appropriate for judicial determination. The instant rules apparently will have a direct effect upon petitioner's day-to-day business, placing it in a dilemma whether to comply with every requirement of the rules, which would cause an immediate and significant change in the conduct of petitioner's business and cause petitioner to incur the costs of

compliance, or to continue the present procedures and risk prosecution and penalties for noncompliance. (*Abbott Laboratories; Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 62 S. Ct. 1194, 86 L. Ed. 1563 (1942).) Thus, because it appears that the instant rules are final administrative action, this cause is ripe.

The standard of review adopted here is not consistent with the standard applied in our recent decision in *Peabody Coal Co. v. Pollution Control Board*, 36 Ill. App. 3d 5, 344 N.E.2d 279. In *Peabody Coal*, we professed to measure the validity of rules relating to water pollution from point source discharges by the standard announced by the appellate court in *Commonwealth Edison Co. v. Pollution Control Board*, 25 Ill. App. 3d 271, 323 N.E.2d 84 (1974); whether such rules were economically reasonable and technologically feasible for a substantial number of emission sources within the State. Our experience in dealing with the concepts of technological feasibility and economic reasonableness as a matter of reviewing the evidence produced before the Pollution Control Board has convinced us that this approach is unsound for the reasons discussed above. In *Laclede Steel Co. v. Pollution Control Board*, 37 Ill. App. 3d 263, decided this day, we directed the parties to brief and argue the considerations which I have discussed in this concurring opinion. My opinion is that the scope of review announced in the appellate court decision in *Commonwealth Edison*, which we followed in *Peabody Coal*, is inappropriate both as a matter of judicial wisdom and constitutional law. I therefore concur in the opinion of the court.