NORTHWEST HOSPITAL, Plaintiff-Appellee, *v.* ILLINOIS HEALTH FACILITIES PLANNING BOARD, Defendant-Appellant.

First District (4th Division)   No. 77-980

Opinion filed April 6, 1978.

William J. Scott, Attorney General, of Chicago (George H. Klumpner, Assistant Attorney General, of counsel), for appellant.

Edward M. Burke, of Chicago (Nathan & Klafter, of counsel), for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

In an action for administrative review in the circuit court of Cook County, judgment was entered for plaintiff, Northwest Hospital, reversing the final administrative decision of defendant, Illinois Health Facilities Planning Board. Defendant had denied plaintiff's application for a permit, made pursuant to the Illinois Health Facilities Planning Act (Ill. Rev. Stat. 1975, ch. 111½, par. 1151 *et seq.*) to add 154 medical/surgical beds and 12 intensive care beds to its already existing facilities. The trial court found that the denial of the permit for the number of beds requested was against the manifest weight of the evidence.

We affirm the judgment of the trial court.

Subsequent to the initial denial by defendant of plaintiff's September

16, 1975, application, an Appeal Fair Hearing was requested. At the hearing, held November 22, 1976, William Ewing testified that he is the project review administrator for the Illinois Department of Public Health. He holds a bachelor's degree in business administration. In his capacity as administrator, he is in charge of the preparation of reports for defendant on proposed projects. He is familiar with administrative Rule 3.05, promulgated pursuant to the Act, which allows variances for proposed projects not in accord with the plan for computed bed needs in certain instances.

Under Rule 3.05.1, bed capacity can be increased where the hospital experiences consistently high occupancy rates; and that upon review, patient occupancy, length of stay, and room utilization are found to be appropriate and that the foregoing experiences will continue. Under Rule 3.05.2,[1] approval for an increase in hospital beds may be given where the principal function to the proposed project is the provision of primary inpatient care to a medically underserved and/or economically depressed population group. Under these rules, the applicant has the burden of proving entitlement to the variance.

Ewing stated that the additional number of beds which may be needed under Rule 3.05.1 is determined by the length of stay, admissions, and lack of available or potentially available beds in the area. A determination as to the need to relieve high occupancy is generally based upon a determination of the hospital's present average daily census, divided by an assumed optimum occupancy rate of 90% for medical/surgical beds, 75% for pediatric and obstetric beds, and 60% for intensive care beds. This methodology would determine how many additional beds are needed to relieve high occupancy and allow the hospital to operate at the optimum occupancy rate.

The original review, made about a year before the hearing, indicated that there was insufficient evidence to substantiate the need for all the beds requested. At most, 25 beds were believed to be sufficient to relieve high occupancy. A subsequent review was undertaken in the spring of 1976 with other factors considered, such as patient origins, data relating to the hospital's area, and distances from other hospitals. After this second report was presented in April 1976, an *ad hoc* committee was formed to study and review the matter.

Ewing gathered additional utilization data and formulated a calculation based upon the number of patient days of care in 1975 and divided by 365 to arrive at an average daily census. This figure was divided by the

---

[1] Application for a variance under Rule 3.05.2 was made during the course of the Appeal Fair Hearing when it appeared that a variance may be allowed under this rule. The hearing officer allowed consideration of all variances under Rule 3.05. No questions are now raised concerning the timeliness of the application.

assumed optimum occupancy rate under the 1975 plan. In the case of medical/surgical beds, that rate was 88%. Thus, using this formula, 48 additional beds were deemed to be needed. Applying the same methodology, a total of 12 intensive care beds were needed, the number presently in use at plaintiff's facility.

Ewing also concluded that the average length of stay for the medical/surgical unit was excessive at 10.2 days. Plaintiff contested Ewing's conclusions, claiming further that the length of stay figure should be 9.2 days. Under this latter figure, additional bed need would be 17.

The *ad hoc* committee recommended that plaintiff be allowed 12 additional intensive care beds because patients had to be moved sooner than they should because of the insufficient number of such beds.

On cross-examination, Ewing testified that he worked on plaintiff's application for over one year but neither he nor any board member ever visited the hospital. He also worked on the applications for variances requested by Provident and Tabernacle hospitals. Although both of these hospitals are located in areas that have an excess number of hospital beds, variances were given since the hospitals were serving a population that could not receive adequate medical care, in an area that was economically depressed, and patients had to travel to Cook County Hospital instead of a closer facility. Such factors were not a consideration in determining plaintiff's application.

Ewing recommended approval of the applications for Provident and Tabernacle hospitals although they had occupancy levels of 71% and 76% respectively.

The hospital area's public transportation was not studied, nor the ability of patients to travel to other facilities. Although plaintiff's facility was running at 100% capacity, it was felt that a strict numerical formula should be applied. The formulas used in computing bed need were applied solely to plaintiff's application.

Ewing further testified that he agreed with the second official report of the Department of Public Health which stated that variance 3.05.2, relating to medically underserved population groups, was precisely the type of situation which plaintiff comes within. The report also noted that this was so although a paradox existed in that the area is the most heavily over-bedded in the State. Dividing the hospital service area into specific areas, plaintiff would need 164 new beds to accommodate its area of service. Ewing stated that the report related to a variance not then claimed by plaintiff, despite the conclusion of the official report that the application requested the proper variance.

For plaintiff, Peter Rusin testified that he is director of planning at Northwest Hospital. His qualifications include a bachelor's degree in management and a master's degree in public health. Rusin was involved

in plaintiff's application, and was assisted by the Chicago Hospital Council and the auditing firm of Arthur Anderson and Company. Both agreed that plaintiff's occupancy had remained high for the past five years, reaching 103% in 1975, and that occupancy would remain at 95-100% when the proposed addition was completed. The Arthur Anderson Company concluded that many patients had to travel well outside of their immediate community for care due to the lack of other major clusters of hospital resources near plaintiff's facility, and that expansion would not have a significant impact on the utilization of other hospitals in the area.

The review process for plaintiff's application consisted of three levels of examination. The first level was before a local planning body, the Inter-Hospital Association of the Western Suburbs. Cost-containment was discussed at length since plaintiff's project cost was about $8,000,000 while other projects under review were planned to cost between 40 and 90 million dollars. The application was unanimously approved.

The second review was done by Dr. Martin Gallagher of Comprehensive Health Planning, Inc. Public hearings were held, but no adverse testimony was offered. Costs were broken down into two classifications. The renovation and remodeling of the present facility would cost $5,300,000, and the bed addition would cost $2,700,000. The cost per bed for the proposed addition would be $16,000. In contrast, the cost per bed was $100,000 for Tabernacle Hospital, and $180,000 for Provident Hospital. Various additional meetings were held where additional data was presented.

At the hearing, it was also disclosed that the Chicago Fire Department sometimes had to take emergency calls to facilities other than plaintiff's because of the high occupancy problem. The next closest facility was 4.5 miles away. The Board of Comprehensive Health Planning recommended that the project be approved.

The last level of review was before defendant. It was pointed out that other hospitals in the area were experiencing very high occupancy rates, and that plaintiff drew 70% of its patients from within a 3-mile radius of its facility and 82% of the patients in the area had to leave their community and travel 8-10 miles to other facilities. It was also indicated that plaintiff's facility has only 2.4 beds per thousand population in its primary service area, while the national average is 4.2 per thousand, and for Chicago the figure is 3.4 per thousand. Based upon the overall Chicago average, plaintiff would need 194 additional medical/surgical beds merely to operate at 100% occupancy, and 275 beds to operate at 88% occupancy.

Dr. Martin Gallagher testified that he is the executive director of Comprehensive Health Planning, Inc., of Metropolitan Chicago. He holds a doctorate degree in health organization research and a bachelor's degree in sociology. Comprehensive Health Planning is the reviewing

agent for the State of Illinois and has reviewed approximately 90% of all applications that have come before defendant.

In initially reviewing plaintiff's application, the project review committee of Comprehensive Health Planning recommended that the project for modernization be approved, but that the expansion project be denied. This recommendation was unanimously overturned by Comprehensive's executive committee after a presentation by the Chicago Hospital Council. Comprehensive's board subsequently approved the application.

Dr. Gallagher testified that plaintiff's application was the most closely scrutinized application, based upon extensive data, that he could recall. Public meetings were held where nearby hospitals and community groups were invited to comment. Gallagher and his staff visited plaintiff's facility several times. Comprehensive concluded that there was no "substantial base on which the State had made any contention that this organization should be denied its application."

The reasons given by Gallagher for the conclusion that the variance should be allowed under Rule 3 were:

"This applicant has fulfilled every phrase of that particular variance and, in fact, more so than any other applicant that has come before our agency for review. In fact, it has a five (5) year high occupancy length of stay. In fact, if it was compared with the other hospitals in the area, whether you go at 9.2 or what the State says, 10.2, it still is at a low point with respect to all of the others. In fact, there are only two (2) other facilities in their immediate area that have lower average length of stays in M/S, lower than theirs. Now, that fulfills the part of the criteria under this variance. Also, about their assurances of continued subsequent occupancy length of stay and utilization review, * * * this applicant has assumed the burden of proof under the State Plan, and as such, in its documentation has presented a methodological approach to get at its bed need situation, and I might point out where we're at difference from the State's point of view is it looks at future projections. The State's testimony relies heavily on present and historical figures and data. In planning if you want to get an idea about what is needed, you have to project into the future, you have to put in age factors and everything else along those lines, you have to put in the elements of population in the community, what you expect, and you have to use different base years. * * * [O]n this linear regression model developed by the Chicago Hospital Council it plugs in all those variables with respect to what future situation will be occurring within that area setup. * * * This is very consistent with good planning, promoting what the future will

be. The State, in their particular model, as was pointed out in the testimony, was based purely on present and historical data. That's even contrary to the model that is promoted for their State Plan, which is on projected data, population data, age data and the like, so on. This particular section on the variance, this particular applicant has indeed proposed some assurance of continuous subsequent occupancy, length of stay, utilization review."

Dr. Gallagher was familiar with the application of both Provident and Tabernacle hospitals. Both variances could be justified only on the basis that the service area was medically underserved and of low health status. Comprehensive recommended rejection of Provident's application since it was felt that its application was not within the cost containment policy of the State. In contrast, plaintiff's project was well within the range of cost containment.

On cross-examination, Gallagher stated that Comprehensive had reviewed eight other applications which sought a variance under Rule 3.05.1, but had never before recommended approval of any application under that rule.

In the circuit court proceedings, after arguments were heard and the evidence considered, the trial judge reversed the decision of defendant and stated:

"Insofar as the determination as to the number of beds which are to be allocated to this hospital in its expansion, I find with respect to the number of 47 which is a—apparently a general surgical bed—that the means by which the Board arrived at their determination was arbitrary, capricious and unreasonable; and that they were made with little or no concern for the public interest or for the future needs of the community which is served by this hospital.

Accordingly, I reverse the decision of the Board as contrary to the manifest weight of the evidence, and contrary to the law."

OPINION

Initially, defendant contends that the above statement by the trial court indicates that it was holding that the administrative rule for determining the propriety of granting a variance was invalid. Obviously, defendant is relying upon that portion of the court's comments which stated that "the means by which the Board arrived at their determination was arbitrary, capricious and unreasonable * * *."

■■ ■ The standard for reviewing the determinations of an administrative agency varies with the nature of the action taken.

"When an administrative agency exercises its rule-making powers, it is performing a quasi-legislative (as opposed to a quasi-judicial) function. This fundamental principle explains the

discrepancy in the standards of judicial review of each type of proceeding; that is, when dealing with an adjudicatory proceeding, a reviewing court may only set aside the agency decision if it is clearly against the manifest weight of the evidence. When reviewing administrative rules and regulations, on the other hand, a court may not invalidate the regulation unless it is clearly arbitrary, unreasonable or capricious, because administrative agencies are inherently more qualified to decide technical problems and the mechanics of dealing with them. Because the courts lack the expertise possessed by administrative agencies, they should hesitate to find a regulation unreasonable. To the contrary is the situation where technical expertise is not a significant factor in making the rule. In those situations, a court's role is analogous to that of an appellate court reviewing a trial court's decision." *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 270-71, 346 N.E.2d 212, 218.

Reading the entire statement in context, it is clear that the trial court was not ruling upon the validity of the administrative rule pertaining to variances. Rather, the court's ruling was that the manner in which defendant arrived at its decision that the application should be denied was "arbitrary, capricious, and unreasonable." While such language is that which is ordinarily used in testing the validity of an administrative rule (*Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 319 N.E.2d 782; *cf. Holiday Inns, Inc. v. Pollution Control Board* (1975), 27 Ill. App. 3d 704, 327 N.E.2d 364) the plain meaning of the comment indicates that the trial court believed that defendant employed an arbitrary formula to determine whether plaintiff's application should be granted under the variances set forth in Rule 3.05, which was not used for any other application.

Upon administrative review, the court is limited to considering only the evidence submitted in the administrative hearing and may not hear further evidence or conduct a hearing *de novo.* (*Lake County Contractors Association v. Illinois Pollution Control Board* (1972), 6 Ill. App. 3d 762, 286 N.E.2d 600, *aff'd* (1973), 54 Ill. 2d 16, 294 N.E.2d 259.) Furthermore, while the findings of an administrative agency are deemed to be prima facie correct and cannot be disturbed unless against the manifest weight of the evidence (Ill. Rev. Stat. 1975, ch. 110, par. 274; *Fenyes v. State Employees' Retirement System* (1959), 17 Ill. 2d 106, 160 N.E.2d 810), a reviewing court will not hesitate to grant relief where the record does not disclose evidentiary support for the agency's determination. *Kerr v. Police Board* (1974), 59 Ill. 2d 140, 319 N.E.2d 478.

■■ Our own review of the record that was preserved in the course of these administrative proceedings convinces us that the trial court acted correctly in ruling that the decision to deny plaintiff's application for 154

medical/surgical beds was against the manifest weight of the evidence. Defendant concedes that plaintiff established a need for additional medical/surgical and intensive care beds. The only area of dispute is the number of beds that should be added.

Defendant contends that the basis upon which need is quantified is contained in Rules 3.07.1 through 3.07.8 which specifies the methodology for determining bed need. Rule 3.07.1 specifies that the optimum occupancy percentage for medical/surgical beds is 88%. It is defendant's position that this percentage is conclusive insofar as determining the number of beds needed to relieve overcrowding at plaintiff's facility.

This argument must fail for several reasons. The methodology contained in Rule 3.07 is for computing bed needs under the general plan. It is not for use in determining the appropriateness of an application for a variance. It does not specify the method for determining whether the factors enumerated in Rule 3.05 are present and warrant the granting of a variance.

Furthermore, while defendant considered the 88% figure in determining whether overcrowding existed at plaintiff's facility, no formula which is contained in any of the Rules was employed. Ewing testified that the methodology employed was a simple formula which was calculated to reduce overcrowding as it then existed. It had not been applied to other applications and appears to have been created by Ewing solely for use in considering plaintiff's application.

In sharp contrast to defendant's method of computing bed need, plaintiff employed many approaches and highly sophisticated projections to determine present and future need, and designed an application which utilized the many factors thus employed. In its proposal, costs for the additional beds were substantially lower than the projects which served as a basis of comparison.

Plaintiff also had the support of every agency, public and private, which reviewed the application. Specifically, Dr. Gallagher stated that the application was the most closely scrutinized that he could recall, and that the applicant had fulfilled every phrase of the variance allowed under Rule 3.05.1.

Under the circumstances of this case, we must conclude that the trial court was correct in holding that defendant's finding was against the manifest weight of the evidence and in reversing the decision to deny plaintiff's application.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and DIERINGER, J., concur.