ROY ERNEST KERN *et al.*, Plaintiffs-Appellants, *v.* UREGAS SERVICE OF WEST FRANKFORT, INC., *et al.*, Defendants-Appellees.—(IRA FLOOD & LESTER FOLLOWELL, d/b/a F & F Heating and Air Conditioning, Cross-Plaintiff; WILLIAMS ENERGY COMPANY *et al.*, Cross-Defendants; MONSANTO COMPANY, Counterplaintiff and Third-Party Plaintiff; UREGAS SERVICE OF WEST FRANKFORT, INC., Counterdefendant and Counterplaintiff-Appellant; WILLIAMS ENERGY COMPANY, INC., Third-Party Defendant; THE SUBURBAN COMPANIES, Counterplaintiff-Appellant; IRA FLOOD & LESTER FOLLOWELL, d/b/a F & F Heating and Air Conditioning, *et al.*, Counterdefendants-Appellees; ROY ERNEST KERN, Counterdefendant-Appellee.)

Fifth District    No. 77-290

Opinion filed October 29, 1980.

184

Harris & Lambert and James W. Sanders, both of Marion, for appellants Roy Ernest Kern *et al.*

Caldwell, Troutt & Alexander, of Benton, for appellants Uregas Service and the Suburban Companies.

Campbell, Furnall, Moore & Jacobsen, of Mt. Vernon (Glenn E. Moore, of counsel), for appellees Ira Flood & Lester Followell, d/b/a F & F Heating & Air Conditioning.

Wham & Wham, of Centralia, for appellee Lennox Industries, Inc.

Mitchell & Armstrong, Ltd., of Marion, for appellee Monsanto Company.

Mr. JUSTICE KASSERMAN delivered the opinion of the court:

Plaintiffs and defendants-counterplaintiffs, Uregas Service of West Frankfort and The Suburban Companies, appeal from the judgment of the Circuit Court of Franklin County in an action for personal injuries and property damages brought by Roy Ernest Kern and his wife, Mary Alyce Kern, and for personal injuries brought by the Kerns' son, Roy David Kern, and their nephew, Gary Carter. The action arose out of a propane gas explosion at the Kern home on February 14, 1970, which resulted in personal injuries to the plaintiffs and the complete destruction of the Kern home.

Plaintiffs sought judgment against Uregas Service of West Frankfort (hereinafter Uregas), the gas supplier, which is a wholly owned subsidiary of The Suburban Companies; The Suburban Companies (hereinafter Suburban), the corporate stockholder of Uregas; Monsanto Company (hereinafter Monsanto), the manufacturer of the gas regulator; Lennox Industries (hereinafter Lennox), manufacturer of the propane gas furnace; and Ira Flood & Lester Followell, d/b/a F & F Heating and Air Conditioning (hereinafter F & F), the furnace repairmen. Plaintiffs charged that defendants Uregas and Suburban were negligent in overfilling the gas storage tank at the Kerns' home with a greater quantity of gas than permissible under National Fire Protection Association (NFPA) standards; in filling the tank when the regulator was not under separate cover and properly protected from the elements in violation of NFPA standards; and in failing to inspect the gas tank, gas lines and equipment. Plaintiffs charged F & F with negligence alleging failure to properly

inspect the furnace, gas lines, gas tank and equipment; failure to warn plaintiffs of the defective condition, including the gas leak in the gas tank, gas lines and equipment; and failure to repair the defective condition. Negligence was also charged against Lennox for failure to properly manufacture the furnace, failure to inspect the furnace before sale and failure to warn of a defective condition.

Plaintiffs charged strict liability against Monsanto based on defective design of the gas regulator. Strict liability was also charged against Lennox on the basis that the furnace was unreasonably dangerous and defective in that it permitted gas to escape from it.

Uregas and Suburban filed counterclaims for indemnity against F & F, Monsanto and Lennox. Uregas and Suburban also counterclaimed for indemnity against Roy Kern, alleging that he was contributorily negligent in requesting that the gas storage tank be filled when the regulator was not under appropriate cover.

F & F also filed a counterclaim against Monsanto for indemnity should F & F be found guilty; and Monsanto filed a counterclaim against Uregas for indemnity should Monsanto be found guilty.

The jury awarded verdicts in favor of plaintiffs and against defendants Uregas and Suburban only. The jury awarded Roy Kern $5,000, Mary Alyce Kern $55,000, David Kern $65,000, and Gary Carter $10,000. The jury found against all counterplaintiffs and in favor of all counterdefendants on the counterclaims.

The jury's response to eight special interrogatories was consistent with the general verdicts. In answer to the special interrogatories the jury found that Uregas was negligent; that the Lennox furnace was not in an unreasonably dangerous condition when it left the manufacturer in 1962; that Mrs. Kern did not misuse the furnace; that Mr. Kern did not misuse the furnace; that Uregas did not misuse the furnace; that Lennox was not guilty of negligence; that Roy Kern was not contributorily negligent; and that the gas regulator was not defective.

On appeal, plaintiffs Roy Kern and Mary Alyce Kern seek a new trial on the issue of damages only as to defendants Uregas and Suburban. All plaintiffs ask for a new trial on all issues as to Monsanto, Lennox, and F & F. Defendants Uregas and Suburban request, on appeal, a new trial on their counterclaim against Monsanto, Lennox, F & F, and Roy Kern.

The Kerns owned a home in West Frankfort, Illinois, which was heated by a Lennox liquified propane gas furnace. The propane gas was piped into the furnace in the basement from a storage tank located approximately 10 feet from the house. This tank had been purchased subsequent to the acquisition of their property by the Kerns, and the low-pressure regulator that was a part of the original system was transferred to the new tank. Mr. Kern testified that he had nothing to do with

the installation of the tank or regulator; and Al Phillips, deputy state fire marshal, stated that shortly after the explosion, Mr. Kern told him that he did not remember who put the regulator on the tank.

Prior to February 14, 1970, Mr. Kern went out to check the propane tank fuel gauge and discovered that the tank contained only 15 percent of its capacity of fuel. He then ordered more gas from Uregas Service of West Frankfort, his supplier of liquified propane gas. On the morning of Friday, February 13, 1970, Carl Lee, a part-time delivery man for Uregas, made the delivery of gas to the Kerns' home upon the instruction of Charles McFarland, his immediate superior and the plant supervisor for Uregas. Lee went to the Kern house between 8 and 8:15 a.m. He proceeded to fill the tank to 90 percent capacity and then recorded that amount on the fill-ticket and attached the fill-ticket to the door of the Kern house. He then left. The evidence introduced at trial indicates that the weather conditions on February 13 and 14, 1970, were substantially the same. The temperature ranged from 30°-32° F., with a mixture of snow and rain.

The evening of February 14, 1970, Mr. and Mrs. Kern were at their home along with their son, Roy David, their daughter, Susan, and her boyfriend. Mrs. Kern's sister and brother-in-law, Rev. and Mrs. Carter, and their children were visiting at the Kern home also. Around 5 or 6 p.m., Mrs. Kern opened the basement door and noticed an unusual odor. She testified that it smelled like something hot. She called her husband who then went down to the basement to check the odor. He saw flames of about 16 or 18 inches in length coming out the front of the furnace in the utility room. He went upstairs, turned the thermostat down and tele-phoned the furnace repairman, Ira Flood, requesting him to come out and check the furnace. Ira Flood arrived at the Kern house approximately 30 minutes later, and Mr. Kern told him about the flame that he had seen. Flood testified that he did not observe any flame "roll-out" while he was at the house nor did he smell any gas. According to Mr. Flood, he cut off the gas to the furnace at the manual valve just preceding the furnace controls and performed various repairs. He stated that when he turned the gas on again, the gas flame was operating normally. He related that he was unable to determine the cause of the flame roll-out, but that before he left he suggested to Mr. Kern that he should call the gas company to inspect the regulator on the tank.

Around 10 p.m., Mrs. Kern noticed that it was chilly in the house and started to turn up the thermostat. She heard a hissing sound coming from the basement in spite of the fact that the basement door was closed. When she opened the basement door, she smelled gas. She then woke her husband to tell him that she smelled gas. Mr. Kern got out of bed and went down to the basement. He did not turn on the basement light. Mr.

Kern smelled the gas and heard the hissing noise which sounded like it was coming from the vicinity of the furnace. He could not see any pilot light or flame in the furnace. He then turned off the gas with the same manual control valve Ira Flood had used earlier, and the hissing stopped.

In the meantime, David Kern ran outside and turned off the gas at the tank. The family could still smell gas but it did not seem too bad. Mr. Kern went upstairs to prepare for work that night, and Mrs. Kern, David, and Gary Carter went into the kitchen. Not more than five or 10 minutes after the gas was cut off, the explosion occurred.

In the explosion, Mr. and Mrs. Kern, David Kern and Gary Carter were injured. The Kerns' house was completely destroyed, together with their household furnishings, a half-ton pickup and a station wagon.

Al Phillips, the deputy Illinois state fire marshal, investigated the explosion scene on February 15, 1970. He testified that the gas regulator was not under a hood and was installed with the vent port pointing to the side. He also stated that the regulator appeared to be "frozen up."

Jeremy Davis, an expert witness who testified for plaintiffs, stated that in his opinion the explosion was caused by gas escaping into the basement. Based on the hissing sound the Kerns testified they had heard, he concluded that the leak was caused by high gas pressure in the lines leading to the appliances and that this high pressure, in turn, was caused by a combination of two things: first, the overfilling of the gas storage tank; and second, the lack of protective cover over the gas regulator attached to the gas storage tank.

The regulator in this case was a low-pressure gas regulator manufactured in 1947 by Fisher Controls, which is now a subsidiary of Monsanto. Mr. Davis testified that the purpose of a low-pressure. gas regulator is to reduce the high pressure of the gas as it comes from the storage tank to a lower pressure in the gas lines leading from the regulator to the appliances where the gas is used, known as the "downstream" gas lines. The type of regulator in use at the Kerns' installation consisted of two chambers divided by a diaphragm which moves up and down as it equalizes the pressure. Gas enters the regulator at a high pressure from the tank, forcing back a plunger in the regulator which allows the gas to enter. As gas passes through the upper chamber of the regulator, the lower chamber, filled with air, provides a reference pressure and the gas pressure is equalized with the atmospheric pressure so the gas passes into the lines on the downstream side of the regulator at the lower pressure. The air in the lower chamber enters and exits through a vent port. A pressure relief valve permits gas to escape from the gas line or regulator if the gas pressure becomes excessive. In the regulator used on the Kerns' system, the pressure relief valve was integrated into the regulator and

consisted of a spring and small valve. If the gas pressure becomes excessive, the valve is forced open. This permits the gas to pass from the upper chamber to the lower chamber and to be released through the pressure relief valve into the atmosphere. The pressure relief valve and the air intake are vented through a common vent port. Thus, the regulator is constructed to permit gas to escape from the regulator and not to be forced into appliances or furnaces downstream at excess pressure.

The proper functioning of the regulator results in the intake of air at atmospheric pressure as a reference pressure and the escape of excess gas pressure. If the vent port were to become clogged, not only is there no atmospheric pressure for a reference pressure, but the pressure relief valve would not function and the excess pressure cannot escape. The excess pressure would then pass into the air chamber below the diaphragm and, being unable to escape, remain there increasing the reference pressure. The gas pressure would no longer be equalized to atmospheric pressure and instead would travel into the downstream gas lines at a higher than normal pressure.

Mr. Davis testified that he was unsure of where the leak in the gas line was located. From the resulting condition of the furnace, it being pushed inward and not outward by the explosion, he concluded that it was not in the furnace itself but somewhere outside the furnace in the basement. Mr. Davis testified that water could have run into the vent port, which was neither covered nor pointed downward, causing the vent port to freeze over and become clogged due to the freezing weather conditions. He further testified that this could allow excess gas pressure to escape into the downstream gas lines. In Mr. Davis' opinion, the flame roll-out was caused by intermittent increases in gas pressure occasioned by the alternate freezing and thawing of the regulator before it froze over completely. He also testified that the increased pressure in the lines could have blown out the pilot light on the furnace, which would explain why the second time Mr. Kern went into the basement he could see no pilot light or flame in the furnace. He stated that the consequence of the pilot light going out would have been to trigger an automatic shutoff valve on the furnace, known as a thermocouple, which would shut off gas to the burners in the furnace. This could have resulted in gas at a high pressure escaping through a leak in the gas lines and resulting in the hissing noise.

Mr. Davis further testified that in his opinion the overfilling of the gas storage tank also contributed to causing the explosion. He stated that a 90-percent fill on a day when the temperature was 32° F. exceeded the level permitted by the regulations of the Department of Law Enforcement. Mr. Davis concluded that because the tank was overfilled, liquid droplets would be sucked into the pipe leading into the regulator. He

stated that as these droplets entered the regulator, they would vaporize and that as they vaporized, they would absorb heat, which would result in a reduction in temperature in the regulator of 1° or 2°. He testified that when the droplets turned to vapor, the liquid would be expanded 250 times.

David Sumner, a mechanical engineer, testified as an expert witness on behalf of Monsanto. He stated that he was employed by Fisher Controls, a subsidiary of Monsanto, in the capacity of chief engineer. He testified that he supervised the engineering department and was engaged in research and development, primarily the design of low-pressure gas regulators. His testimony regarding the consequence of the vent port being clogged with ice was substantially the same as Mr. Davis'. He testified that he had run numerous tests involving the freezing of regulators and that the results were always the same—the regulator loses its reference pressure, creating a hazardous condition. Based on the facts assumed in a hypothetical question asked Mr. Davis, he testified that the explosion was caused by the regulator freezing in an open position. The freezing caused erratic gas pressures in the house, which resulted in the furnace malfunctioning and culminated in gas escaping into the basement. Mr. Sumner did not agree, however, that the overfilling of the tank contributed to the gas explosion. He explained what would happen under both the circumstances of the regulator freezing in a closed position and an open position. In his opinion, if the regulator froze in a closed position, the gas would be shut off and the pilot light would go out, turning off the furnace. When the house eventually cooled off, although there would be a demand for gas, the thermocouple (automatic shutoff valve) in the furnace would prevent any gas from going to the pilot light or burners of the furnace. Sumner stated, however, that if the regulator freezes in an open position, gas is flowing through the regulator and the appliances will continue to operate so long as the demand for gas flow remains the same. If the demand for gas changes, for example, when the furnace goes off, the regulator diaphragm tries to move upwards to close off the gas supply. The diaphragm moving upwards reduces the volume of the upper chamber thus increasing the pressure that the gas is under. This forces the gas into the lower chamber, and if the vent port is clogged due to freezing, the excess pressure does not escape into the atmosphere. The gas remains in the lower chamber at a higher pressure, thereby interfering with the maintenance of the reference pressure at atmospheric pressure.

Mr. Sumner testified that there are two ways to install a regulator to prevent freezing, either with the vent port facing downwards or under a protective hood to prevent water running into the regulator. He testified that Monsanto now imprints instructions on the regulator that it should be installed with the vent port facing down. He also testified that it was

common knowledge in the gas industry that regulators should be installed with the vent port facing down.

Mr. Davis testified that the regulator used here was defective in design, due to the fact that it had a single vent port for both the pressure relief valve and the air intake. He testified that if two separate vent ports were installed on the regulator, one for pressure relief and another for the air intake, the danger resulting from the regulator freezing over would be reduced. Mr. Sumner, however, did not agree. It was his opinion that if the regulator was installed so that one vent port would be susceptible to catching water, the other would be no less susceptible. Such construction, he believed, would in fact increase the danger of freezing since twice as much water would run into the regulator. Further, according to Mr. Sumner, regulators sold in Illinois must be approved by Underwriters Laboratories, who require that the pressure relief valve must be an integral part of the regulator and must be vented out a common port with the air intake for the regulator.

John McCreery, a registered professional engineer, specializing in heating and air conditioning, testified as an expert witness for Uregas and Suburban. It was his opinion, based upon a hypothetical question assuming facts substantially the same as in the intant case, that there was a gas leak in the lines between the manual shutoff valve on the furnace and the burners in the furnace. In his opinion, the vent port on the regulator could have frozen and this would subject the furnace to higher than normal gas pressures. He also concluded that the regulator would have frozen in an open position and that it would have been at some time after the furnace repairman left because the furnace was functioning normally at that time. Mr. McCreery was of the opinion that the overfilling of the tank did not contribute to the explosion in any way. He also testified that installing the regulator under a hood would prevent freezing and that while he was not sure that Pamphlet 58 required a regulator to be under a hood, he would absolutely require it.

Plaintiffs introduced into evidence the National Fire Protection Association's Pamphlet 58, Storage and Handling of Liquified Petroleum Gases (1965). This pamphlet was adopted by the Illinois Department of Public Safety, now the Department of Law Enforcement, as part of its regulations for the storage, transportation, sale, and use of liquified petroleum gas. These regulations were promulgated under the authority of section 3 of "An Act to regulate the storage, transportation, sale and use of liquified petroleum gases" (Ill. Rev. Stat. 1969, ch. 104, par. 121). Plaintiffs relied on section 2.8 of Pamphlet 58, Protection of Container Accessories, which was in effect in 1970, as requiring that the regulator be installed under appropriate cover. Section 2.8 states:

"PROTECTION OF CONTAINER ACCESSORIES

(a) Valves, regulating, gauging and other container accessory equipment shall be protected against tampering and physical damage. * * *"

Paragraph 8, page 13, of the State of Illinois Rules and Regulations of the Department of Law Enforcement, also in effect in 1970, provided that:

"No suppliers of liquid petroleum gases shall service any installation not in compliance with the LP gases law, rules and regulations."

Charles McFarland, Uregas' plant manager from 1968 to the date of the explosion, testified that he had filled the Kerns' tank on numerous occasions prior to February 14, 1970. He testified that he had read Pamphlet 58 and was aware that it was good practice to install a regulator under a hood. He further testified that all of Uregas' regulators were under hoods; however, he did not recall at trial whether they required that regulators be placed under a hood. McFarland stated that he did not consider the Kerns' regulator to be properly protected but that he never suggested to Mr. Kern that it should be protected although he continued to service the Kerns' installation.

Carl Lee, a part-time delivery man for Uregas, testified that he filled the Kerns' tank on February 13, 1970. His immediate superior was Charles McFarland. He had attended two training sessions sponsored by Uregas, one concerning filling gas storage tanks and one relating to firefighting. He testified that he was trained never to fill tanks over 90 percent of capacity. He also stated that he was never taught anything about regulators but that he presumed that they were supposed to be under a hood since all the regulators on the Uregas tanks were under hoods. He could not recall whether McFarland had taught him not to service an installation if it did not comply with the rules and regulations of the National Fire Protection Association or the Department of Public Safety.

H. W. Winchester testified that prior to February 14, 1970, he worked for Uregas Service of Cape Girardeau as foreman and was McFarland's superior. He stated that Uregas recommended that regulators be installed under a hood. He also testified that he was familiar with Pamphlet 58 and the regulation in Pamphlet 58 requiring that regulators be protected from tampering and physical damage. He further stated that it was his understanding that the regulation meant that regulators should be protected from the weather. He testified that two ways to protect the regulator from the weather were to either install the regulator under a hood or install it with the vent port facing down.

Melvin Garner testified that he was presently the regional service manager for Williams Energy Company, Inc. (Williams). He stated that he had taught training sessions for Uregas bulk delivery drivers prior to February 1970. He stated that he taught according to the material in

Pamphlet 58 and that he usually specifically taught that the vent had to be protected from the outer elements.

Lennox' witnesses, Howard Pitts and Loren Eichorn, testified as to the model, design, operation, and features of the Lennox GH6 100M, the furnace in the Kerns' home.

The evidence adduced at trial indicates that as a result of the explosion, all four plaintiffs suffered personal injuries. Mrs. Kern suffered closed, severely comminuted displaced fractures of both legs, both the tibia and fibula, at and in the ankles. She was treated primarily by Dr. Richard Fox, who testified that as a result of her injuries she had developed a permanent steppage gait due to shortened heel cords. He related that Mrs. Kern has also developed a knock-kneed condition due to the deformity of her left ankle, the joint of which had been totally destroyed. In the doctor's opinion the deformity of her left foot will probably get worse and may require a bone fusion to alleviate the pain. Dr. Fox testified that a bone fusion would prevent any flexion of the ankle. He stated that Mrs. Kern has developed traumatic arthritis in her left knee and both ankles; that neither foot can be dorsiflexed; and that the right ankle also has limited motion, stiffness and swelling. Mrs. Kern testified that she has difficulty in walking and in standing for any length of time. Due to her injuries Mrs. Kern was in the hospital for four weeks; and after her release from the hospital, she was confined to bed for seven months. She then was required to use a wheelchair for two months, after which she was able to move around using a walker for assistance. Her medical bills were $2,271.40 and any future surgery, it was estimated, would cost $2,500 to $4,000.

Mr. Kern also suffered injuries as a result of the explosion. Dr. Rosecan, a specialist in internal medicine, and Dr. Halstead, a chiropractor, testified regarding the injuries suffered by Mr. Kern. Dr. Rosecan treated Mr. Kern and diagnosed his condition as traumatic myositis, or inflammation, of the left quadriceps muscle, with a factor of superficial femoral cutaneous neuritis. He also had a synovitis of the left knee with some instability of the left knee joint. Mr. Kern also suffered lumbar strain aggravated by a pre-existing arthritic condition. According to Dr. Rosecan, he also had a depressive reaction to the occurrence.

Dr. Rosecan testified that he treated Mr. Kern with various medications. He further stated that, in his opinion, the lumbar strain and traumatic myositis were permanent injuries and would cause Mr. Kern pain in the future.

Dr. Halstead diagnosed Mr. Kern as suffering from seven permanent injuries to his back and sciatic nerve as a result of the explosion. Mr. Kern's medical expenses amounted to $2,023.28.

Both Mr. and Mrs. Kern were employed at the time of the occur-

rence; and as a result of their injuries, both were unable to work for a period of time. Prior to the accident Mrs. Kern worked for the Cooperative Extension Service of the University of Illinois for 20 hours a week at $1.80 an hour. She testified that she would be unable to return to this employment because of her physical limitations resulting from the accident. She returned to work in October of 1976, teaching needlecraft to senior citizens.

Mr. Kern was employed as a mine examiner for Old Ben Coal Co. at the time of the accident. He testified that before the accident he was earning $48 for each eight-hour shift, time and one-half on Saturdays, and double time on Sundays. He testified that he was working six and seven days a week. Mr. Kern testified that due to his own injuries and those of his wife, he was off work for 18 months. He stated that it had been necessary for him to remain at home and assist his wife for 7½ months while she was bedridden. Dr. Halstead also testified that Mr. Kern's disability prevented him from working for those 18 months.

The evidence submitted at trial with respect to the value of personal property and real property was uncontradicted by defendants. Mrs. Kern testified that together with Mr. Kern she had drawn up an itemized list of personal belongings and that the value of the personal property was $29,848. The Kerns' half-ton pickup and a station wagon were also destroyed. Max Brunton, a car salesman with 25 years experience, testified that the fair cash market value of the two vehicles was $3200. Additionally, the Kerns' house was totally destroyed by the explosion. Mr. Kern testified that, in his opinion, the fair cash market value of the house and lot was $52,000.

The jury returned a verdict in favor of all the plaintiffs against Uregas and Suburban, awarding Mr. Kern $5,000; Mrs. Kern, $55,000; David Kern, $65,000; and Gary Carter, $10,000. Verdicts were returned in favor of all other defendants and against all the plaintiffs on their claims. The jury also found against all counterplaintiffs on their counterclaims.

Plaintiffs, Roy Ernest Kern and Mary Alyce Kern, urge on appeal that they are entitled to a new trial on the issue of damages alone. They contend that the amount of the verdicts, $5,000 and $55,000 respectively, is inadequate considering the evidence of their injuries and damages.

In the case of Mr. Kern his medical expenses and lost wages alone totaled $20,023.28. Mrs. Kern's medical expenses, lost wages and medical expenses reasonably to be expected in the future aggregate between $17,155.40 and $18,655.40. Neither of these computations of damages includes amounts for the value of the house, household contents, vehicles, or pain and suffering.

■■ Ordinarily, the question of damages is peculiarly one of fact for the jury and courts are reluctant to interfere with the discretion of the jury in

its assessment of the damages. A court of review, however, will depart from the general rule where the award is palpably inadequate or a proven element of damages has been ignored, where the amount of the verdict is shown to be erroneous or the result of passion or prejudice, or where it clearly appears from the uncontradicted evidence that the amount of the verdict bears no reasonable relationship to the loss suffered by plaintiff. *First National Bank v. Szwankowski* (1969), 109 Ill. App. 2d 268, 248 N.E.2d 517.

■■ Nevertheless, a reviewing court is not justified in ordering a new trial on the issue of damages alone unless: (1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the question of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the record suggests neither that the jury reached a compromise verdict, nor that in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability. *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 380 N.E.2d 786; *cf. Sommer v. City of Taylorville* (1978), 59 Ill. App. 3d 765, 375 N.E.2d 1031.

Uregas and Suburban argue that the verdicts here were compromise verdicts as indicated by the fact that Mr. Kern was only awarded $5,000 and the strongest case for contributory negligence could be made against him. Uregas and Suburban also argue that their liability was not amply supported by the evidence.

The expert testimony at trial established that the cause of the explosion was the freezing of the vent port of the regulator in an open position and that the freezing of the vent port was the result of the regulator not being installed under a hood or with the vent port facing down.

Initially, Uregas and Suburban argue that the rules and regulations of the Department of Law Enforcement regarding the handling, storage and transportation of liquified petroleum gas, specifically Pamphlet 58, did not require that the regulator be placed under a hood or protected from the elements. They conclude that as a consequence they were not in contravention of the statutory provision prohibiting them from servicing installations not in compliance with the rules and regulations of the Department. Further, they urge that they were not negligent in filling the Kerns' gas tank when the regulator was not covered and had been installed with the vent port facing to the side. Uregas and Suburban further argue that the rules and regulations involved here are arbitrary, unreasonable, not related to the purpose sought to be attained, and unduly burdensome on the gas supplier.

■■ Defendants, Uregas and Suburban, as suppliers of the liquified petroleum gas, had a statutory duty not to service installations which did

not comply with the rules and regulations of the Department of Law Enforcement. The Department was within the scope of its statutory authority in adopting the National Fire Protection Association's rules and regulations regarding liquified petroleum gas. It was also within the statutory authority of the Department to promulgate rules prohibiting the servicing of those installations not in compliance with the rules and regulations of the Department. The act relating to the regulation of the storage, transportation, sale and use of liquified petroleum gases provided:

> "The Department of Public Safety has power to make, adopt and enforce rules and regulations governing the keeping, storage, transportation, sale or use of liquified petroleum gases. Such rules and regulations shall be in substantial conformity with the generally accepted standards of safety concerning the same subject matter. Rules and regulations in substantial conformity with the published Standards of the National Fire Protection Association for the Storage and Handling of Liquified Petroleum Gases shall be deemed in substantial conformity with the generally accepted standards of safety." (Ill. Rev. Stat. 1969, ch. 104, par. 121.)

The Department of Law Enforcement is empowered by statute to make, adopt and enforce rules pertaining to liquified petroleum gas. However, in order to be valid, the rules adopted must be in accordance with the statutory authority vested in it, must be related to the purpose of the act and neither arbitrary nor in contravention of any express statutory authority. *People ex rel. Charles v. Telford* (1977), 48 Ill. App. 3d 928, 363 N.E.2d 613.

■■ Pamphlet 58, as adopted by the Department of Law Enforcement, sets forth numerous rules and regulations designed to ensure the safe use, transportation, sale and storage of liquified petroleum gas. Extensive regulation is reasonable and necessary in order to protect the public welfare and safety when dealing with a commodity of a hazardous nature. The Department, having more expertise in this highly technical area, is more qualified to determine what regulation is necessary, and the court should refrain from invalidating the regulations unless they are clearly arbitrary, capricious, and unreasonable. *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 346 N.E.2d 212.

■■ Further, the regulations do not place an unreasonable burden on the supplier of LP gas. The supplier of necessity should be required to be more knowledgeable concerning LP gas than the average consumer. Additionally, the gas supplier would also have the equipment and personnel required to inspect and service the installations. The burden on the gas supplier is not so onerous as to be confiscatory, as Suburban and Uregas urge. Moreover, in this particular case the problem which arose

was admittedly known to the gas serviceman and did not require complicated, costly, or lengthy inspections to ascertain.

Suburban and Uregas finally contend that the phrase "protected against tampering and physical damage" does not include damage from weather conditions and that it is void for uncertainty.

■■ Language contained in a regulation, as well as statutory language, is to be given its ordinary meaning. (*Chrobak v. Metropolitan Life Insurance Co.* ⟨7th Cir. 1975⟩, 517 F.2d 883.) We conclude that "physical damage" as used in the regulations is intended to include any interruption of the function of the regulator resulting from an outside source, including the elements of nature. Webster's Third New International Dictionary 1706 (1971) defines "physical" as "* * * relating to or in accordance with the laws of nature; * * * of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary." "Damage" is defined by Webster's as "loss due to injury; injury or harm to person, property or reputation." Webster's Third New International Dictionary 571 (1971).

H. W. Winchester and Melvin Garner, employees of Uregas, both testified at trial that they were aware that the regulators were required to be protected from physical damage and they understood physical damage to include damage from the natural elements.

While we recognize that "protected" does not expressly require placement under a cover or hood, the regulator in the instant case was not sheltered or protected in any way. Uregas was aware of the need to protect regulators as evidenced by the testimony of its agents and employees, Charles McFarland, Carl Lee, and H. W. Winchester, that Uregas regulators were installed under hoods. Both Charles McFarland and Carl Lee were aware that the Kerns' regulator was not properly protected from the weather. Nevertheless, as Uregas employees, they serviced the installation in contravention of their statutory duty.

We conclude that Uregas serviced the Kerns' installation on numerous occasions when its employees were aware that the installation was not in compliance with the rules and regulations requiring the regulator to be protected from physical damage. As a result of the regulator not being protected, it became incapable of operating properly, ultimately resulting in the explosion. The verdict of the jury finding Uregas and Suburban guilty of negligence is amply supported by the evidence.

Regarding the contention of Uregas and Suburban that the evidence indicates that Roy Ernest Kern was contributorily negligent, the question of contributory negligence is for the jury to decide. (*Moran v. Gatz* (1945), 390 Ill. 478, 62 N.E.2d 443.) Mr. Kern testified that he had nothing to do with the installation of the low-pressure regulator on the liquified propane gas tank. Further, the jury, in response to special interrogatories pro-

pounded to it, specifically found that Mr. Kern was not contributorily negligent and that Uregas and Suburban were negligent. The court in *Szwankowski* stated:

> "Part of the rationale supporting the practice of propounding an interrogatory to a jury is that a jury more clearly comprehends a particularized special interrogatory than a composite of all the questions in a case, and therefore, presumably, the jury has more intensively focused its attention upon the question presented. [Citation.] Extending that rationale to the fact of this case compels this court to the belief that the jury thoroughly considered the liability issues and the ample evidence supporting the verdict. The court is unable to say, with any certainty, that the jury compromised the damages awarded against the liability. This is especially so when the alternative is to hold that the general verdict of the jury was not supported by the evidence and the jury totally disregarded the answers to the special interrogatories." *First National Bank v. Szwankowski* (1969), 109 Ill. App. 2d 268, 275, 248 N.E.2d 517, 521.

Based on the evidence adduced at trial and the jury's answer to the special interrogatories, we conclude that the jury's finding regarding contributory negligence was not against the manifest weight of the evidence.

■■ Having determined that the jury's finding as to the liability of Uregas and Suburban was amply supported by the evidence and that the verdict was not a result of a compromise on the issue of liability or plaintiffs' contributory negligence, we conclude that the damages awarded by the jury were palpably inadequate as to plaintiffs, Roy Ernest Kern and Mary Alyce Kern. The awards bear no reasonable relationship to the damages suffered by them. The $5,000 in damages awarded to Mr. Kern by the verdict of the jury was less than his medical expenses and lost wages, as established by uncontradicted testimony. Although Mrs. Kern's lost wages and medical expenses amounted to less than the $55,000 awarded to her, she also suffered permanent injuries to her legs, and pain and suffering. Further, both Mr. Kern and Mrs. Kern suffered substantial damages in the form of property loss.

We conclude, therefore, in light of the jury's palpably inadequate award of damages to Roy Ernest Kern and Mary Alyce Kern that a new trial solely on the issue of damages is justified as to them. We further conclude that the issue of liability and damages are so separate and distinct that a new trial limited to damages alone is not unfair to defendants, Uregas and Suburban, and would not result in an injustice to them.

Plaintiffs contend that the verdicts in favor of Monsanto, Lennox, and

F & F were against the manifest weight of the evidence. Defendants-counterplaintiffs, Uregas and Suburban, also contend that the jury's findings on their counterclaims for indemnity against Monsanto, Lennox, F & F, and Roy Kern were against the manifest weight of the evidence.

A judgment is not against the manifest weight of the evidence unless the opposite conclusion is clearly evident or the verdict is palpably erroneous and wholly unwarranted. Whether the court would differ with the jury's conclusion is not important so long as reasonable persons could differ in their conclusions. *Fintak v. Catholic Bishop* (1977), 51 Ill. App. 3d 191, 366 N.E.2d 480.

The evidence with respect to Lennox established that Mr. Kern heard a hissing noise in the area or vicinity of the furnace. There was no evidence to indicate that the furnace itself was the source of the leaking gas or the cause of the gas leak. The testimony of Mr. Davis indicated that the explosion occurred somewhere outside the furnace. There was no evidence adduced at trial to establish that the Lennox furnace operated in a manner other than would be expected under the circumstances. Further, the jury's finding in favor of Lennox in response to a special interrogatory relating to Lennox's liability was consistent with the general verdict.

Monsanto was joined as defendant in this case on the basis of strict liability in tort. It is alleged that the design of the regulator was defective and unreasonably dangerous. Although the evidence at trial established that the regulator was not properly installed or protected, Mr. Davis, a witness for plaintiffs, testified that the regulator would be less susceptible to clogging due to freezing if two vent ports were built into the regulator. However, this testimony was contradicted by Mr. Sumner who testified that the use of two vent ports would make the regulator more susceptible to freezing rather than less susceptible because the creation of the additional vent port would have permitted more water to enter the regulator. Mr. Sumner also testified that the regulator was not vulnerable to clogging or freezing if it was installed with the vent port facing down or under a protective covering.

■■ A great portion of the briefs and arguments on this appeal are addressed to matters of a technical nature; however, this court is not the correct forum for determining such factual and scientific disputes. (*Tulgetske v. R. D. Werner Co.* (1980), 86 Ill. App. 3d 1033, 408 N.E.2d 492.) We are permitted to consider the evidence bearing on the technical aspect of this cause only so far as is necessary to determine the propriety of the jury's verdicts. These questions of fact were properly submitted to the jury (*Reynolds v. American Oil Co.* (1975), 32 Ill. App. 3d 905, 337 N.E.2d 403; *Tulgetske v. R. D. Werner Co.*), and the jury resolved them in favor of Lennox and Monsanto.

The verdicts of the jury will not be disturbed unless they are against

the manifest weight of the evidence. The court in *Didier v. Jones* (1978), 61 Ill. App. 3d 22, 377 N.E.2d 572, considered the function of the jury and the issue of whether a verdict was against the manifest weight of the evidence and stated:

"Verdicts and judgments are not considered against the manifest weight of the evidence unless a conclusion opposite to that reached by the jury is clearly evident or the jury's verdict is palpably erroneous. [Citation.] 'Manifest weight' as applied in determining whether a verdict or judgment is against the manifest weight of the evidence is that weight which is clearly evident, plain and indisputable. [Citation.]

* * *. It is well settled that it is the function of the jury to resolve controverted issues of fact [citation], to determine the credibility of the witnesses and the weight, if any, that should be accorded their testimony. [Citation.] Where there is a conflict in the testimony, a reviewing court may not substitute its judgment for that of the jury in passing on the weight of the evidence and on the credibility of the witnesses. [Citation.] A verdict may not be set aside merely because the jury could have determined the credibility of the witnesses differently or drawn different inferences of fact, and where credible evidence supports the verdict, the court may not say that the conclusions other than the ones drawn by the jury are more reasonable. [Citation.]" 61 Ill. App. 3d 22, 27, 277 N.E.2d 572, 575-76.

We conclude that the jury's verdicts in favor of both Lennox and Monsanto as to the plaintiffs and counterplaintiffs were not against the manifest weight of the evidence.

Additionally, both plaintiffs and counterplaintiffs contend that the verdicts in favor of F & F were against the manifest weight of the evidence.

The complaint charged F & F with negligence for failure to properly inspect, failure to warn of a defective condition and failure to repair the defective condition.

Ira Flood was a furnace repairman, not an LP gas installation repairman. He inspected and repaired the furnace and gas lines leading into the furnace. There was no evidence that the furnace was the source of the explosion nor was there any evidence that there were leaks in the gas line present when Ira Flood was at the Kern home. In fact, the evidence established that Ira Flood performed a thorough inspection and repair of the furnace and that it was in perfect working order when he left the Kerns' home. Flood testified that regulators were not within the scope of his trade as a furnace repairman and that he had little knowledge of them. He did, however, suggest to Mr. Kern that the regulator might be causing

problems with the furnace, there being no other explanation for the conditions Mr. Kern had described to him. Flood advised Mr. Kern to have the gas company check the regulator. Flood carried out his duties as a furnace repairman, and there was no evidence to support the conclusion that he performed his duties negligently. He had no duty to inspect and repair the regulator and did not undertake its inspection or repairs. The verdicts in favor of F & F were not against the manifest weight of the evidence.

■■ ■ Plaintiffs next argue that the trial court erred in refusing to allow them to amend the ad damnum of their complaint prior to the commencement of trial. Immediately prior to the selection of jurors, plaintiffs moved to amend the ad damnum with respect to Mr. Kern from $50,000 to $100,000; with respect to Mrs. Kern from $100,000 to $150,000; with respect to Roy David Kern from $30,000 to $100,000; with respect to Gary Allen Carter from $30,000 to $50,000; and with respect to the property loss from $70,000 to $90,000. Plaintiffs' motion was denied on the basis of surprise to defendants. We conclude that the court erred in this respect. Amendments to pleading are to be liberally allowed, and the jury is not bound to fix damages within the confines of the ad damnum. The court in *Long v. Duggan-Karasik Construction Co.* (1974), 23 Ill. App. 3d 812, 320 N.E.2d 553, held that there was no error in allowing plaintiff to amend his ad damnum from $100,000 to $400,000 at the close of the evidence immediately prior to submitting the case to the jury. The amendment to the ad damnum in the instant case would not change the quantum of proof as to any material fact, nor would any change of issues have resulted. This being so, we conclude that the court erred in denying plaintiffs' motion to amend their ad damnum. Further, a factor considered by the court in *Long*, the $280,000 originally sought is not such an insignificant amount so as to raise the possibility that defense counsel might somehow have been impelled to try harder had the exposure been $490,000.

■■ The next point that plaintiffs raise as error is the restriction of their examination of potential jurors on voir dire. Plaintiffs' counsel requested that he be allowed to inquire of jurors if they had any prejudice against a combined verdict of $490,000 or individual verdicts in the amounts of $150,000, $100,000, $100,000, $50,000, or $90,000. These figures were in excess of the existing ad damnum. The court ruled that it would allow questions on specific amounts so long as it was limited to some sum within the range of the ad damnum. Plaintiffs were not prohibited from inquiring of jurors, in a less particularized fashion, whether they had any prejudice against large verdicts. Thus, they were able to determine that the jurors were free of fixed opinions indicating bias or prejudice against large verdicts. (*Jines v. Greyhound Corp.* (1964), 46 Ill. App. 2d 364, 197

N.E.2d 58.) We find that the court did not abuse its discretion in limiting plaintiffs' inquiries on specific sums of money when plaintiff was not unduly circumscribed in ascertaining jurors' general attitudes. *People v. Lobb* (1959), 17 Ill. 2d 287, 161 N.E.2d 325.

Defendant Suburban contends that the claims of Roy Kern and Mary Alyce Kern are barred by the statute of limitations. The complaint was initially filed on October 12, 1971. Suburban was joined as a defendant February 14, 1972, two years after the explosion occurred. Suburban argues that it was not properly joined because in 1972 its corporate name was The Suburban Companies, not Suburban Gas Corporation as it was designated when joined as a defendant in 1972. Suburban also argues that it was not served with process until after the statute of limitations had run. Further, Suburban claims that section 46(4) of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 46(4)) is not applicable in this case to enable plaintiffs to join it as a party after the statute of limitations had run.

Based on the record before us, we conclude that plaintiffs need not rely on section 46(4) of the Civil Practice Act. Section 21(3) of the Civil Practice Act provides in part:

"Misnomer of a party is not a ground for dismissal but the name of any party may be corrected at any time, before or after judgment, on motion, upon any terms and proof that the court requires." Ill. Rev. Stat. 1971, ch. 110, par. 21(3).

Further, under the provisions of Supreme Court Rule 103(b) (Ill. Rev. Stat. 1971, ch. 110A, par. 103(b)), a party may be served with process after the statute of limitations has run if reasonable diligence is used in obtaining service on the defendant. This statute was considered by the court in *Jackson v. Navik* (1974), 17 Ill. App. 3d 672, 308 N.E.2d 143, where the court stated:

"It is correct that an action is commenced when the complaint is filed (Ill. Rev. Stat. 1971, ch. 110, par. 13) and that in situations where the statute of limitations has run in the interval between the filing of the complaint and service of summons, the effect of the statute of limitations is avoided when reasonable diligence is exercised in obtaining service of process [citations]." 17 Ill. App. 3d 672, 675, 308 N.E.2d 143, 145.

The record in the instant case indicates that within two years after the date of the explosion, plaintiffs added as defendants Uregas Company-Suburban Propane Corp., Suburban Petroleum Corp. of California, and The Suburban Gas Corporation. In July 1972, service of an alias summons was attempted on The Suburban Companies in Los Angeles County, California. The return on this summons recites that the sheriff was informed by the personnel of The Suburban Companies in Pomona, California, that the officers for service of process were at the Williams

Energy Company in Tulsa, Oklahoma. An additional alias summons was issued on July 31, 1972, and it was served on The Suburban Companies in Tulsa, Oklahoma, on August 8, 1972. On September 11, 1972, The Suburban Companies entered its special appearance and moved to quash the service of process. A further alias summons was issued, and on April 18, 1973, it was served on the vice-president of The Suburban Companies. In May 1973, another motion to quash was filed by The Suburban Companies, alleging that no relief was asked against The Suburban Companies. This motion was granted on June 11, 1973, and on the same day defendant withdrew its September 11, 1972, motion to quash. Plaintiffs moved to correct the name of defendant from Suburban Gas Corporation to The Suburban Companies on June 11, 1973. This motion was supported by the affidavit of the secretary of Williams Companies which stated that prior to 1970 The Suburban Companies had been known as Suburban Gas. On July 2, 1973, The Suburban Companies was served with process. In September 1973, Suburban entered its special appearance and filed a motion objecting to jurisdiction. This motion was denied.

■■ The record establishes that Suburban was originally joined as a defendant before the statute of limitations expired although it was misnamed. Section 21(3) of the Civil Practice Act, in effect when Suburban, Suburban Propane Corp., Suburban Petroleum Corp. of California and The Suburban Gas Corporation were first named as defendants, permits the correction of the name of a party at any time, even after judgment. In spite of the fact that service was had on defendant after the statute of limitations had run, we conclude that the unrefuted facts establish that plaintiffs used reasonable diligence in obtaining service as required by *Jackson v. Navik*. Consequently, plaintiffs' claims against Suburban were not barred by the statute of limitations.

Plaintiffs and defendants Suburban and Uregas contend that the closing argument by counsel for Lennox was highly inflammatory and prejudicial in that counsel expressed his personal opinion on the liability of the various parties involved and on the indemnity defenses. After having reviewed the record, we conclude that counsel's comments during closing argument were not so inflammatory and prejudicial as to constitute reversible error. The jury was properly instructed by the trial court that the closing remarks of counsel were not to be considered as evidence by them. Defendants Uregas and Suburban objected at trial to counsel's use of the pronoun "I" and to the tenor of his argument, and the error was corrected by the trial court.

■■ The character and scope of closing argument is left largely within the discretion of the trial court, since it is in a better position to assess any prejudicial impact the argument may have on the jury. The issue of the

prejudicial impact of Lennox' closing argument was again brought to the trial court's attention in the post-trial motions of plaintiffs and Uregas and Suburban. The trial court denied the post-trial motions. The determination of whether the comments of counsel are prejudicial to the right of a defendant to receive a fair trial is a matter resting in the first instance in the sound discretion of the trial court, and its ruling will not be disturbed on review unless there is a clear abuse of discretion (*Greig v. Griffel* (1977), 49 Ill. App. 3d 829, 364 N.E.2d 660; *Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 274 N.E.2d 178.) We find no abuse of discretion in the case at bar.

■■ Plaintiffs further urge on appeal that the trial court erred in refusing to give the instructions plaintiffs offered on the definition of "unreasonably dangerous." Plaintiffs argue that they are entitled to a new trial against Monsanto and Lennox based on the failure to give the definitional instruction on "unreasonably dangerous" as tendered by them. Plaintiffs also contend that the failure to give certain other instructions offered by them also requires a new trial against Lennox.

Plaintiffs proposed definitional instruction on "unreasonably dangerous," plaintiffs' instruction No. 22, states:

"A product is unreasonably dangerous if it exposes the user to a greater risk of injury than is reasonably necessary in light of its nature, intended function and forseeable use."

Plaintiffs' instruction No. 22a, proffered after plaintiffs' No. 22 was denied, states:

"A product contains an unreasonably dangerous condition if it is not reasonably safe for such purposes or uses as could be expected to be made of it."

The failure to give a definitional instruction of "unreasonably dangerous" is not reversible error. (*Pyatt v. Engel Equipment, Inc.* (1974), 17 Ill. App. 3d 1070, 309 N.E.2d 225.) Illinois Pattern Jury Instruction, Civil, No. 400.06 (2d Ed. 1977 Supp.) (hereinafter IPI) now defines the term "unreasonably dangerous," but this instruction had not been adopted at the time of trial in the instant case. Moreover, the term "unreasonably dangerous" uses language which is commonly understood and familiar to the layman. The term, when considered in the context of the instructions as a whole, was sufficiently defined for the jury to understand the import of the term "unreasonably dangerous." (*Pyatt v. Engel Equipment, Inc.*; cf. *Hedge v. Midwest Contractors Equipment Co.* (1964), 53 Ill. App. 2d 365, 202 N.E.2d 869.) Further, the definitional instruction tendered by plaintiffs failed to include the phrase "at the time it left the manufacturer's control," which the court stated was the basis for refusing the instruction. Plaintiffs did not tender an instruction including the language referred to by the trial court.

With respect to their action against Lennox, plaintiffs contend that it was error to refuse plaintiffs' instructions Nos. 23 and 35 and to give Lennox' instructions Nos. 2a and 3.

■■ Plaintiffs' instruction No. 23 and Lennox' instruction No. 3 both concern themselves with the liability of a manufacturer for any injury resulting from the use of an unreasonably dangerous product. Lennox' instruction contained the limitation that a manufacturer is not liable if the product is misused. Plaintiffs' instruction contained the addition that liability attaches even though the product was not purchased directly from the manufacturer. Lennox' instruction adequately instructed the jury on the issue of liability and its extent while plaintiffs' instruction lacked language indicating that the injuries must be proximately caused by the product. The court did not err in refusing to give plaintiffs' instruction No. 23 and in giving Lennox' instruction No. 3.

■■ Plaintiffs' instruction No. 35 and Lennox' instruction No. 2a are instructions relative to the burden of proof. In their brief, plaintiffs argue that Lennox' instruction was improper because it was a burden-of-proof instruction including a misuse defense while their burden-of-proof instruction did not include the affirmative defense of misuse. Upon comparing the two instructions, we find that both plaintiffs' instruction and Lennox' instruction included the defense of misuse. Further, although the jury specially found there had been no misuse, it was not improper to instruct the jury on misuse since Lennox adduced evidence at trial relative to misuse of the furnace.

Suburban finally contends that it was error for it to be held liable for the negligent acts of Uregas on the grounds that Uregas was its agent. It contends that no agency between itself and Uregas existed. Suburban also contends that no instructions defining agency or scope of authority were given to the jury.

■■ The record shows that IPI Civil No. 50.05, in which an agent is defined, was given as plaintiffs' instruction No. 10, and IPI Civil No. 50.06, defining scope of authority, was given as defendants Suburban and Uregas' instruction No. 18. It is well settled that one corporation can be the agent of another. (*Cf. Sherman v. Field Clinic* (1979), 74 Ill. App. 3d 21, 392 N.E.2d 154.) The question of the existence and scope of an agency relationship are questions of fact to be determined by the jury. (*Sherman v. Field Clinic.*) Further, if one corporation is an affiliate or subsidiary of another, the affiliate or subsidiary may still act as an agent of the parent corporation if the elements of agency are met. (*Graubremse GMBH v. Berg Manufacturing & Sales Co.* (7th Cir. 1969), 417 F.2d 1201.) In the instant case, the record discloses that there was sufficient evidence adduced at trial to justify the jury finding that Uregas was an agent of Suburban. For example, Major O. Brunner, vice-president and secretary

of the Williams Companies, testified that he was not familiar with whether Uregas became the agent or servant of the Suburban Companies but that the policies and procedures followed by Uregas were those that were consistent with the desires and wishes of the stockholders, who were at that time Suburban. Mr. Brunner further testified that the selling and distribution of LP gas by Uregas was done pursuant to the directions of Suburban.

For the foregoing reasons, the order of the trial court denying the post-trial motions of Roy Ernest Kern and Mary Alyce Kern is reversed, and this cause is remanded to the trial court for retrial on the issue of damages only as to that portion of the cause which relates to the claims of Roy Ernest Kern and Mary Alyce Kern, plaintiffs, against Uregas Service of West Frankfort and The Suburban Companies, defendants. In all other respects the judgments of the trial court are affirmed.

Reversed in part; affirmed in part and remanded.

HARRISON and SPOMER, JJ., concur.