HARRY JONES, Indiv. and as Executor of the Estate of Clara Jones, Deceased, Plaintiff-Appellee, v. PETROLANE-CIRGAS, INC., Defendant-Appellant.

Fifth District   No. 5—85—0088

Opinion filed August 4, 1986.

David L. Joslyn and Gerald B. Gallagher, both of Gallagher, Joslyn & McGurn, of Oak Brook, and David L. Sauer, of Lackey, Warner & Sauer, of Centralia, for appellant.

Eric L. Terlizzi, of Pfaff, Garner & Terlizzi, of Salem, and William S. Daniel, of Daniel & Jenson, of Belleville, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Defendant, Petrolane-Cirgas, Inc., appeals from a judgment of the circuit court of Marion County entered upon a jury verdict in favor of plaintiff, Harry Jones, who brought this action individually and as executor of the estate of his deceased wife, Clara Jones. Plaintiff's wife was killed and he was injured when a propane explosion destroyed their home. After finding defendant guilty of trespass and negligence, the jury awarded plaintiff a total of $274,550.68 in damages. On appeal, defendant claims it was entitled to a directed verdict, a judgment notwithstanding the verdict, or a new trial because plaintiff failed to prove defendant liable under either trespass or negligence. Defendant also contends the court erred in denying a motion to strike plaintiff's testimony regarding his ongoing kidney problems, and in instructing the jury on the issue of future pain and suffering. We reverse and remand for a new trial.

Plaintiff, who was 73 years old at the time of trial, is a retired Shell Oil Company worker who lived with his 67-year-old wife at their home near Centralia. The energy source for the appliances in their home was propane, which was stored in a 500-gallon tank located about 50 feet from the house. On January 10, 1982, plaintiff went outside to check the level of propane in the tank. He had been in the hospital for several days prior to this time, so he was not aware of

whether anyone had filled his tank recently. A gauge showed it to be filled to 87% of capacity, which led plaintiff to believe someone had filled it while he was away. Plaintiff testified he had never before noticed the tank being filled over 85%.

Plaintiff testified the Universal Butane Company had been supplying him with propane prior to December of 1981. In that month, he received a letter from the company stating it was selling the business to defendant, Petrolane. Plaintiff stated he did not receive any information or solicitation from defendant about providing service, nor had his wife mentioned receiving any correspondence from defendant. However, a Petrolane employee stated the company mailed letters and leases to all Universal Butane customers inviting them to be customers of Petrolane after it purchased Universal Butane. Nevertheless, the parties stipulated at trial that there was never a written agreement between plaintiff and defendant for the purchase of propane or the lease of the tank. Plaintiff testified when he received the letter from Universal Butane, he did not contact anyone else to supply him with propane because he was not in physical condition to do anything since he had just returned home from the hospital. But he stated he intended to contract with a new supplier other than defendant and never would have agreed to purchase propane from defendant. Plaintiff testified he had not given defendant or anyone else permission to fill his tank in January of 1982. Although he had an idea it was defendant which had filled his tank, he did not contact defendant to protest but continued using his propane appliances. Plaintiff also testified that in the years Universal Butane provided him with service, he never had to call the company for propane deliveries. Instead, the company estimated when a customer would need a new supply and would deliver the gas without a request by the customer.

On January 11, 1982, plaintiff was watching television in the kitchen of his home shortly after 10 p.m. His wife had already gone to bed. Plaintiff testified that everything suddenly turned red as the house was blown apart by an explosion. Plaintiff, who was seriously injured, was pulled from the burning debris by a neighbor. His wife was killed by the blast.

Plaintiff testified he smelled nothing unusual prior to the explosion. However, he indicated that there was always an odor of burned propane in the house due to the lack of a vent on a stove. Further testimony from plaintiff established that he had laid the pipe from the propane tank to the house and had done some of the plumbing in the house which carried the propane. At one time plaintiff also used field gas in the house, tapping into fields near his home, but had not used

this source of fuel in the past four or five years. He had experience dealing with these matters because he had worked laying pipe and making connections when he worked for the Shell Oil Company. He had worked with propane during his time with the company, and had also worked as an oil gauger, checking the level of oil in tanks.

Gerald Freeman testified that he had been employed by Universal Butane and was hired by defendant after defendant purchased Universal Butane. While working for defendant, Freeman delivered propane to plaintiff's home on January 9, 1982. He knocked on the door, and after receiving no answer, left a note in the door notifying plaintiff that a delivery had been made. Freeman stated he put 250 gallons of propane into the tank. The tank was 35% full before he started, according to the gauge on the tank, and he filled it to 85%. He testified that Petrolane managers had told him 85% was a safe level to which to fill a propane tank in the winter.

Robert Wacker, an assistant regional manager for defendant, testified that defendant had purchased Universal Butane in December of 1981. He stated that a company manual instructs drivers not to overfill propane tanks, because there are possible dangers when a tank is overfilled. Wacker testified that the maximum level to which a propane tank should be filled is 80 to 85 or 87%. He stated that not filling a tank to the 87 to 100% range provides a margin of safety. He further testified that a tank would have to be almost 100% full before liquid propane could escape into a customer's lines. Wacker also stated that drivers do not normally do safety checks on a customer's propane system, but that such tests would be done by a serviceman. The company manual states that such safety tests are done when service has been off or a customer runs out of gas, but not when a tank is filled in an existing, operating system. Wacker further explained that propane is heavier than air and thus can accumulate in low spots.

Charles Cima, a fireman who testified as an expert for plaintiff, stated that what occurred at plaintiff's home was a propane explosion, with propane building up in the crawl space under the home to cause the blast. It was his opinion the ignition source was a space heater in the den. Walter Kluthe, a gas expert employed by Laclede Gas Company in St. Louis, testified for defendant and confirmed Cima's opinion that this was definitely a propane explosion. It was Kluthe's opinion there was a leak in the propane lines in the crawl space under the home which caused propane to escape and accumulate there.

In an effort to show inspection standards in the gas industry, plaintiff presented Roger Cox, the owner of a propane distributorship,

who testified that he would inspect a customer's propane system if that customer were new to his business, even if the customer had not run out of propane and had not undergone a shutoff of the system. Walter Kluthe, the expert from Laclede Gas, testified that his company would test a natural-gas system of a new customer even if the customer had a currently operating system. Plaintiff also presented published industry guidelines which he contended require inspection of a system in the case of any new customer, regardless of whether it was an operating system. Defendant's experts testified that these standards call for inspections when service has been shut off or a customer runs out of gas, but not when a tank is filled in an existing, operating system. As noted above, Robert Wacker of Petrolane testified it was his company's policy not to inspect the systems of new customers who had operating systems.

Several witnesses had inspected plaintiff's propane tank after the explosion. These witnesses stated that when a valve on the tank was opened, they could smell an odor normally associated with propane. Walter Kluthe, the expert from Laclede Gas, testified he conducted a test on the propane in the tank after the explosion and found it was properly odorized under various government standards. Also, Gerald Freeman, who filled plaintiff's tank, testified he smelled the odor of propane when he finished the filling operation.

Kluthe and James Myers, a Petrolane employee, both testified that a relief valve on the propane tank would have prevented any dangerous buildup of propane in the tank by allowing any excess pressure to escape into the atmosphere. This led Kluthe to believe an overfill condition did not cause the explosion. He also stated that if a tank were dangerously overfilled, if there were to be any adverse effects they would have occurred much closer in time to the actual overfilling than two days later. Kluthe also stated that a tank filled to 90% of capacity would still have been safe in the circumstances of this case. Robert Wacker, another Petrolane employee, stated that the regulators in plaintiff's propane system were tested after the explosion and were found to be working properly. These regulators control the amount of pressure going from the tank into the house.

Randy Sinclair, a district manager for Petrolane, testified regarding what is known as a K factor, which is a method of reporting a propane customer's consumption. Sinclair stated that the December K factor reported for plaintiff's home showed the highest level of propane use since 1979. But he stated that the difference between that figure and figures for other comparable periods of usage was not significant enough to alert anyone of a possible leak of propane. Sinclair

also stated he has never heard of liquid propane getting into a customer's lines by splashing during the filling process.

■■ ■ Defendant claims the court should have granted it a directed verdict, a judgment notwithstanding the verdict, or a new trial. The standards relating to the direction of verdicts and to the granting of new trials are of course different. "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) A verdict will be set aside and a new trial ordered if the verdict is contrary to the manifest weight of the evidence. (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32, 36.) Thus, a more nearly conclusive evidentiary situation is required before a verdict is directed than is necessary to justify a new trial. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 509-10, 229 N.E.2d 504, 513.

■ In *Mizowek,* the supreme court reviewed this distinction and held in that case that although the standard for a directed verdict had not been met, the jury's verdict was contrary to the manifest weight of the evidence and a new trial should have been granted. (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 311, 356 N.E.2d 32, 36.) We find the same holding is required in the case before us. While we cannot say the evidence so overwhelmingly favors defendant that no contrary verdict based on that evidence could ever stand, we believe the verdict for plaintiff was contrary to the manifest weight of the evidence. Because plaintiff alleged several different acts or omissions by defendant as his basis for recovery, we will address the evidence presented on each allegation.

■ Plaintiff alleged defendant had committed a trespass by coming on to his property and putting propane into his tank without permission. Plaintiff acknowledged receiving a letter from Universal Butane stating that company would be sold to defendant, but he denied receiving any further communication regarding the change in ownership or an offer by defendant to provide service to him. Plaintiff testified he would never intentionally do business with defendant. While defendant offered evidence that a letter was mailed to all Universal Butane customers offering to provide them service, it was stipulated by the parties that plaintiff had not signed a written agreement with defendant for the supply of propane. Defendant argues that plaintiff consented to the delivery of propane in January in that he did nothing after learning Universal Butane was selling its business to Petrolane

and did not object when he learned his tank had been filled.

Thus, there is some evidence that defendant trespassed on plaintiff's property when it filled his propane tank without an agreement with plaintiff to be his supplier. However, we find it was contrary to the manifest weight of the evidence to find the trespass caused the explosion. Section 162 of the Restatement (Second) of Torts (1965) states:

> "A trespass on land subjects the trespasser to liability for physical harm to the possessor of the land at the time of the trespass, or to the land or to his things, or to members of his household or to their things, caused by any act done, activity carried on, or condition created by the trespasser, irrespective of whether his conduct is such as would subject him to liability were he not a trespasser."

The cause of this explosion was a buildup of propane in the crawl space under the home which resulted from an undiscovered leak. With plaintiff's tank being 35% full before any action by defendant, there was a substantial amount of propane present regardless of any act by defendant. There was no evidence the explosion could not have occurred without the propane added by defendant. To find defendant's act of filling the tank on January 9 caused the explosion would be contrary to the manifest weight of the evidence. Therefore, the verdict for plaintiff cannot be supported by the trespass theory.

■ Plaintiff alleged various acts and omissions under a negligence theory, including the allegation that defendant failed to adequately odorize the propane which it placed in plaintiff's tank. Plaintiff's only evidence on this issue was his testimony he did not smell anything unusual prior to the explosion. Plaintiff himself admitted the house always had a smell of burned propane fumes due to a propane appliance which was not properly vented. Defendant presented several experts who testified they could smell the odor of propane when they checked the tank after the accident. Gerald Freeman, the man who filled the tank, testified he could smell the propane when he removed the nozzle from the tank after filling it. Walter Kluthe, the expert from Laclede Gas, stated he checked the propane in the tank and found it to be properly odorized under the standards of various government agencies. Furthermore, the evidence showed the odor of propane adheres to the gas so that the propane could have built up in the crawl space and caused an explosion before the gas was noticed by plaintiff in the house itself. There was no evidence the odor would have reached plaintiff in the kitchen before reaching an ignition source. It would be contrary to the manifest weight of the evidence to

find the propane was inadequately odorized. For these same reasons, we must also find it would be contrary to the manifest weight of the evidence to find that any lack of proper odorization was the proximate cause of plaintiff's injuries. Because plaintiff testified about a constant presence of an odor of burned fumes in the house and because the experts all believed the propane accumulated in the crawl space and not in the house, it would be conjecture to find plaintiff would have smelled the propane building up in the crawl space, assuming it was properly odorized.

■ Plaintiff also claims the explosion was caused by the propane tank being overfilled. He elicited testimony from some experts that 87% would be an overfill condition. Plaintiff testified the gauge on the tank read 87% when he checked it on the day after it was filled. Plaintiff raised the inference that the tank was actually filled to more than 87%, since the weather was cold and plaintiff had been using propane heaters and other appliances from the time of the filling to the time he checked the gauge. He also attempted to raise an inference that liquid propane could get into the lines leading to the house due to splashing inside the tank during the filling operation.

Defendant presented significant evidence to refute plaintiff's claims. Gerald Freeman, the man who filled the tank, stated he filled it to only 85% of capacity. Defendant's experts said that was a safe level. Other experts stated that if the tank had been overfilled, a relief valve on the tank would have allowed any excess pressure to escape into the atmosphere. Expert Walter Kluthe testified that if the tank had been overfilled, any adverse consequences would have been noticed more immediately than two days later. Defendant's experts also refuted the claim that liquid propane could get into the lines leading to the house during the filling operation.

While there was some evidence, albeit circumstantial, that the tank was overfilled, there was little evidence to support a finding that an overfill caused the explosion. Plaintiff presented evidence that the explosion was caused by a buildup of propane in the crawl space. He also attempted to show defendant overfilled the tank. However, plaintiff offered no expert testimony to link the overfilling with the leak or the subsequent explosion. He relied on testimony that overfilling a tank is dangerous to raise the inference that that danger is what caused the explosion in this case. Defendant, for its part, presented experts who testified that even if the tank had been filled above what is considered a safe level, a relief valve would allow any excess pressure to escape into the air. There was no evidence this valve was not working properly at the time of the explosion. (Compare *Kern v. Ure-*

*gas Service of West Frankfort, Inc.* (1980), 90 Ill. App. 3d 182, 412 N.E.2d 1037 (where there was expert testimony that an overfill and an inadequate regulator caused a propane explosion).) We must conclude that a finding that an overfill was the proximate cause of the accident was contrary to the manifest weight of the evidence.

■ Next we address plaintiff's theory that the explosion was caused by defendant's failure to inspect his propane system. Roger Cox, the owner of a propane distributorship, testified for plaintiff that he would test a customer's entire propane system before filling a tank if the customer were a new one for his business, even if that customer had been using propane previously and had not run out of fuel and had not had the system shut off. Walter Kluthe, the expert from Laclede Gas, testified that his company would test a natural-gas system of a new customer even if the system were currently operating. Plaintiff also attempted to show that published industry guidelines required testing in such circumstances. However, defendant's experts testified these standards called for an inspection of the system only when a customer has run out of propane or has had his system shut off for some reason. Petrolane managers stated there is no reason to test an operating system.

There was conflicting evidence as to the proper standard for inspections in these circumstances, including some evidence that defendant had breached a duty to inspect. However, the evidence does not support a finding that any failure to inspect was the proximate cause of the explosion. Plaintiff relies on the inference that an inspection would have revealed the leak in the pipes carrying propane in the crawl space under plaintiff's house. Plaintiff presented no evidence as to when a leak began, or where it existed, or that it was discoverable. Defendant's expert, Walter Kluthe, testified it was his opinion that the leak which caused this explosion lasted no more than four hours prior to the accident. To find a failure to inspect was the proximate cause of the explosion would be contrary to the manifest weight of the evidence when such a finding would have to be based on plaintiff's circumstantial evidence presented here.

■ We have reviewed all of plaintiff's theories under his negligence count and find that the jury's verdict in plaintiff's favor based upon the negligence count is contrary to the manifest weight of the evidence. We previously made the same conclusion regarding the trespass count. Plaintiff generally has attempted to prove his case by showing that because a propane explosion occurred two days after defendant filled his tank, the only possible cause of the explosion was an act or omission by defendant. There was no expert testimony ad-

mitted in evidence regarding what caused the propane to leak and accumulate in the crawl space under plaintiff's home. Plaintiff's expert testified only that there was an accumulation of propane gas in the crawl space and that this caused the explosion. Confronted with little more than this minimal circumstantial evidence, we must set aside the verdict for plaintiff. We cannot say, however, that no verdict in plaintiff's favor on either count could ever stand. (See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) Consequently, we reverse the judgment for plaintiff and remand the cause for a new trial.

Due to our disposition of the case, we find it unnecessary to address the remaining issues raised by defendant.

For the foregoing reasons, the judgment of the circuit court of Marion County is reversed, and the cause remanded for a new trial.

Reversed and remanded.

KASSERMAN, P.J., and WELCH, J., concur.